1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF KENTUCKY
 2                   NORTHERN DIVISION at COVINGTON
                               - - -
 3
      UNITED STATES OF AMERICA,      : Docket No. 17-CR-50
 4                                   :
                          Plaintiff, : Covington, Kentucky
 5                                   : Thursday, May 3, 2018
                                     : 1:00 p.m.
 6    versus                         :
                                     :
 7    RODNEY LAWRENCE JACKSON,       :
                                     :
 8                       Defendant.  :

 9                               - - -
                      TRANSCRIPT OF MOTION TO SUPPRESS
10                      BEFORE DAVID L. BUNNING
                     UNITED STATES DISTRICT COURT JUDGE
11                               - - -

12    APPEARANCES:

13    For the United States:       ANTHONY J. BRACKE, ESQ.
                                   U.S. Attorney's Office
14                                 207 Grandview Drive
                                   Suite 400
15                                 Ft. Mitchell, KY 41017

16    For the Defendant:          F. DENNIS ALERDING, ESQ.
                                   Alerding Law Office
17                                 303 Greenup Street
                                   Suite 300
18                                 Covington, KY 41011

19    Court Reporter:             LISA REED WIESMAN, RDR-CRR
                                   Official Court Reporter
20                                 35 W. Fifth Street
                                   Covington, KY 41011
21                                 (859) 291-4410

22

23

24
          Proceedings recorded by mechanical stenography,
25    transcript produced by computer.
```

2

1          (Proceedings commenced at 12:59 p.m.)

2          THE COURT:  Good morning.  I guess good afternoon,

3     for that matter.

4       Madam Clerk, if you would call the matter set for 1:00,

5     please.

6          COURTROOM DEPUTY:  Covington Criminal 17-50, United

7     States v. Rodney Lawrence Jackson.

8          THE COURT:  Why don't we start with entries of

9     appearance, please.

10          MR. BRACKE:  Tony Bracke for the United States.

11          MR. ALERDING:  Good afternoon, Your Honor.  Dennis

12     Alerding.  I represent Mr. Jackson.  He's seated here to my

13     right.

14          THE COURT:  Okay.  A couple of preliminary matters.

15     The record reflects that one of the witnesses subpoenaed, the

16     witness who was not in custody, the marshal attempted to serve

17     her at the address that was given, and back mid-April

18     indicated that the subpoenaed witness does not live there.

19       He had given his telephone number to her aunt and asked

20     her to pass on the information if she contacted her, and he

21     had not received any calls.

22       Have you gotten anything back, Mr. Pugh?

23          DEPUTY MARSHAL:  I haven't heard anything from her,

24     Judge.

25          THE COURT:  Okay.  So that witness was not served.

1          MR. ALERDING:  We understand, Judge, and that was the

2     address I had for her.

3          THE COURT:  That's fine.  I wanted to make sure the

4     record reflects that.

5       The other witnesses in custody are here, correct?

6          DEPUTY MARSHAL:  They are, except --

7          MR. ALERDING:  There's one missing.  He got

8     transferred in the last few days to Grant County, and I didn't

9     find that out until a day ago, and the jail just notified the

10     marshal this morning.

11       So we'll proceed with the three we have.  If there's any

12     problem, we'll --

13          THE COURT:  Which one is that?

14          MR. ALERDING:  That would be --

15          DEPUTY MARSHAL:  Douglas Allen.

16          MR. ALERDING:  -- Douglas Allen.  The other three

17     were transported here by the marshals.

18          THE COURT:  Fair enough.  Now, in looking through the

19     written filing, the motion is very brief, and the response is

20     equally brief.

21       I just want to kind of lay the groundwork here for the

22     hearing and what's actually contested.

23          MR. ALERDING:  Yes, sir.

24          THE COURT:  This case seems to boil down to the

25     validity of the search and the scope of the search.  Your

1     two-paragraph motion, routine traffic stop, drug dog brought

2     in for no reason, strip search conducted in front of a large

3     group of people, you say all of which are violative of the

4     U.S. Constitution and applicable case law.

5          Well, a routine traffic stop, if there's a basis to pull

6     him over, are you contesting the stop itself?  Because I

7     really want to see what the parameters of the --

8               MR. ALERDING:  Three things.  The stop, was the

9     search then incident to a valid arrest, and then the scope of

10    the search.

11              THE COURT:  Well, the scope of the search is where, I

12    think, the rubber's going to meet the road here.  Ultimately,

13    if there's a traffic violation of some sort -- and I don't

14    know.  It's just Mr. Bracke seems to indicate that there was a

15    traffic violation.

16         If, in fact, there was a violation, and you know under --

17    what is the case law?  The name of it escapes me.  The

18    subjective intent of the officer really -- *Whren*, W-h-r-e-n.

19    If he crosses the center line by a half a -- or doesn't come

20    to a complete stop or is going 26 in a 25, all of those things

21    are legitimate traffic violations that would provide

22    sufficient reasons for the stop.

23         So if you're challenging the stop, that's fine.  We'll

24    hear testimony regarding that.

25              MR. ALERDING:  That will be the briefest part of the

1   whole thing.

2            THE COURT:  That's fine.  Are you challenging the K-9

3   itself?  Are you challenging the training and certification of

4   the K-9 or --

5            MR. ALERDING:  Not at all.  I don't think the K-9

6   alerted on anything, from what I could see in the video, but

7   that will be up to you.

8            THE COURT:  Okay.  Well, we're going to have a video;

9   are we not?

10           MR. BRACKE:  There will be a video, and there will be

11   testimony from the K-9 handler.

12           THE COURT:  And then the *Bell v. Wolfish* case is the

13   Supreme Court case that governs a situation like this.  The

14   case law differentiates between a strip search, which -- a

15   strip search generally is an orifice search of someone's

16   rectum where someone is concealing something, versus a look-in

17   search.  Case law does seem to differentiate between the two.

18      You use "strip search" in your motion.  Is that what we

19   have here where he was strip searched in open --

20           MR. ALERDING:  I think the search -- I think the case

21   is *Amaechi v. West*, which I will cite in my brief.  When the

22   clothing gets rearranged, the belt get loosened and the pants

23   are lowered, that's an invasive search.  May not reach the

24   level of strip searching of an orifice, but I think it's

25   condemned by the Constitution.  I've read it many times.

6

1          THE COURT:  It very well may be, depending on the

2     circumstances.  If I tell someone I'm an officer and I have a

3     legitimate reason to arrest them --

4          MR. ALERDING:  That's a test in this case.

5          THE COURT:  I understand that.  I'm using "for

6     example."  And I say drop your pants, pull your underwear

7     down, and there's 50 people in front of the courthouse, that's

8     probably an issue.  That's probably going to be unreasonable

9     under the Fourth Amendment if that's, in fact, what occurred.

10        We'll just hear what happened.

11        Okay.  So we've got the stop itself, the use of the --

12    well, the use of the dog, I don't know if -- the use of the

13    dog itself is in and of itself not a violation.

14         MR. ALERDING:  That's true.

15         THE COURT:  All right.

16         MR. ALERDING:  We're not raising that issue.

17         THE COURT:  So we've got the initial stop, the stop

18    itself.  Then was there probable cause to arrest.

19         MR. ALERDING:  Yes.

20         THE COURT:  Or at least to detain.  I mean, I don't

21    know what -- we've got the stop, the arrest, and then the

22    legitimacy, legality of the actual search.

23         MR. ALERDING:  Yes, sir.

24         THE COURT:  Okay.  All right.  So that's where we'll

25    go from there.

1        Mr. Bracke, you may proceed.

2            MR. BRACKE:  Judge, really just a matter for record

3    purposes.  In the event of an eventual collateral attack -- I

4    know the Court doesn't have anything to do with negotiations.

5    We had previously extended an offer.  I told Mr. Alerding if

6    we were going to have a suppression hearing in this particular

7    matter, the offer would be revoked, and the defendant would no

8    longer be entitled to the third point for acceptance as far as

9    the United States is concerned.

10       My understanding is Mr. Alerding communicated that to his

11   client, and his client has indicated he has rejected the offer

12   and wants to proceed with knowledge of those circumstances.

13       I think it would be good to confirm that for record

14   purposes at this time.

15           THE COURT:  Very well.  Again, I'm not involved with

16   that.  You're trying to make sure that all the Ts are crossed

17   and Is are dotted.

18       Mr. Alerding?

19           MR. ALERDING:  He made me an offer.  I communicated

20   it to the defendant.  The defendant rejected it.  That's where

21   we stand.

22           THE COURT:  All right.  Fair enough.

23       Mr. Bracke, you may proceed.

24           MR. BRACKE:  United States calls Officer Douglas

25   Ullrich.

1          DOUGLAS ULLRICH, GOVERNMENT'S WITNESS, SWORN

2          THE COURT:  Do you have some sort of exhibit list,

3    Mr. Bracke, or not?  I didn't know if you had one.

4          MR. BRACKE:  Judge, I have two, possibly three DVDs

5    and then I have some paper documents that I may or may not

6    use.

7          THE COURT:  Fair enough.

8          MR. BRACKE:  It's not very extensive.  I didn't think

9    it was worth doing an exhibit list.

10          THE COURT:  All right.  Go ahead.

11       Good afternoon, sir.

12          THE WITNESS:  Good afternoon, sir.

13          THE COURT:  You may proceed, Mr. Bracke.

14          MR. BRACKE:  Thank you, Judge.

15                         DIRECT EXAMINATION

16   BY MR. BRACKE:

17   Q.  Would you identify yourself and spell your last name for

18   the record, please.

19   A.  It's Douglas Ullrich.  It's U-l-l-r-i-c-h.  I'm a police

20   specialist with the Covington Police Department.

21   Q.  In that capacity, how long have you been a police

22   officer?

23   A.  I was hired by Covington September of 2011.

24   Q.  And how -- is that -- has all of your police experience

25   been with Covington?

1    A.   No, sir.  I did about six months as a city police officer

2    in Valdez, Alaska.

3    Q.   So since 2011, you've been continuously employed as a

4    patrol officer for Covington; is that correct?

5    A.   Yes, sir.

6              THE COURT:  Is that where the Exxon spill was?

7              THE WITNESS:  That's where it's based out of.  The

8    spill actually happened a few hundred miles out.  But up

9    there, a few hundred miles isn't anything.

10             THE COURT:  I know that's not germane.  I just was

11   curious.

12        Go ahead.

13   BY MR. BRACKE:

14   Q.   I'm going to ask you about events that occurred on

15   October 4 of 2017.  What was your general assignment on that

16   day?

17   A.   It was the same assignment that I am tasked with to this

18   day.  I am our traffic officer.  My general duties are traffic

19   enforcement, DUI enforcement, collision investigations on

20   third shift patrol.

21   Q.   Are you assigned to a specific beat?  Were you assigned

22   to a specific beat, a specific area of the city on October 4,

23   2017?

24   A.   No, sir.  I'm assigned to the full range of the city.

25   Q.   Now, on that particular day, I'm going to focus your

ULLRICH - Direct                                                    10

1    attention to around 1:24 in the morning.  Was there

2    anything -- in addition to your ordinary patrol, was there

3    anything you were paying special attention to on that

4    particular -- during that shift?

5    A.   Yes, sir.

6    Q.   What was that?

7    A.   Officer Tipton had just completed his FTO training within

8    the last several weeks.

9            THE COURT:  What's FTO stand for?

10           THE WITNESS:  It's his field training officer

11   program.  Once they come out of the academy, they're with a

12   senior officer for several months, and then he had just been

13   cut loose.  He had only been in a car by himself for a number

14   of weeks.

15       I indicated to him that I would spend much of my time in

16   his beat, which was the east side of Covington.

17   BY MR. BRACKE:

18   Q.   Now, on that particular day, are you in uniform?

19   A.   Yes, sir, I was.

20   Q.   And are you in a marked police cruiser?

21   A.   Yes, sir.

22   Q.   Tell the Court what you observed at 1:24 in the morning

23   that drew your attention.

24   A.   Yes, sir.  I was southbound on Garrard Street around 13th

25   on the east side of Covington.  As I was southbound, I

1    observed Mr. Jackson parked in an SUV facing northbound.

2         As I passed him, his driver's window was down.  He looked

3    out of it and had a look of -- maybe not terror, but at least

4    a strong look of alarm.  He was very wide-eyed, looked very

5    concerned that a police car was driving down the street.

6         As soon as I drove past him, he pulled off the curb

7    without signaling and immediately turned right down --

8    eastbound down East 13th Street without signaling again.

9    Q.   Now let me stop for a second.  You discussed -- you

10   mentioned this look on the defendant's face.

11   A.   Yes, sir.

12   Q.   Now, during your seven or so years as a police officer in

13   Covington, you've had occasion to encounter hundreds of

14   people; is that a fair statement?

15   A.   Yes, sir.

16   Q.   Now, are you familiar with the different kinds of, I

17   don't know, responses, visual responses that people give you

18   as a police officer when they see you under a variety of

19   circumstances?

20   A.   Certainly.

21   Q.   Okay.  Compare the expression that the defendant

22   displayed to what you ordinarily see when encountering folks

23   on the street.

24   A.   The look that I received from Mr. Jackson was highly

25   unusual.  I have found in the past that persons that have that

*ULLRICH - Direct*                                                      12

1    strong of a reaction to police presence are frequently

2    involved in criminal activity of some sort.

3              THE COURT:  Now, it's 1:24 in the morning?

4              THE WITNESS:  Yes, sir.

5    BY MR. BRACKE:

6    Q.   And what area of Covington was this again?

7    A.   It's on the east side, in the area of 13th and Garrard.

8    Q.   From your training and experience, is that an area of

9    particular attention or interest to the Covington Police

10   Department?

11   A.   Absolutely it is, sir.

12   Q.   Why is that?

13   A.   A large portion of our -- inordinate percentage of our

14   shootings happen within about a two-block radius of that area.

15   We have a constant trouble with drug problems there to the

16   degree that they changed the traffic pattern on that street to

17   make it a one-way street to attempt to limit traffic in and

18   out to try to mitigate some of the problems.

19             THE COURT:  On what street, Garrard?

20             THE WITNESS:  On east --

21             THE COURT:  You just said you were going different

22   directions.

23             THE WITNESS:  Yes, sir.  So Garrard is a north/south

24   street and it's two ways.  13th Street is now one way,

25   eastbound.

ULLRICH - Direct                                                        13

1          THE COURT:  Okay.  So 13th Street goes from the 75

2     towards the Licking River?

3          THE WITNESS:  It does.  Once you get to where the

4     train tracks are, there's a skip in it, so it really goes --

5     East 13th really only goes from Madison to the Licking River,

6     sir.

7          THE COURT:  Okay, right.  I was just talking from a

8     geography standpoint, it goes that direction?

9          THE WITNESS:  Yes, sir, that's correct.

10    BY MR. BRACKE:

11    Q.  Now, were you aware of the nature of this area on

12    October 4th, 2017?

13    A.  Yes, sir.

14    Q.  Did that factor into your decisions that you made on this

15    particular -- during this particular stop?

16    A.  Yes, sir.

17    Q.  So you talked about the defendant's reaction.  What did

18    you do, based upon that reaction?

19    A.  Once I observed him pull off the curb and make the turn

20    without using his signals, I turned around to run his license

21    plate and eventually conduct a traffic stop for those

22    violations.

23         As I came on to 13th Street, as soon as I got up to his

24    vehicle, he immediately pulled into the parking lane in front

25    of a closed business at the corner of 13th and Wheeler without

ULLRICH - Direct                                            14

1    signaling again, which I further thought was unusual because

2    that business was closed.

3    Q.   Now, you mentioned, I think, three occasions in which he

4    pulled out or turned without signaling.  Is that a traffic

5    infraction?

6    A.   Yes, sir.

7    Q.   Is it one that you cite people for?

8    A.   Certainly.

9    Q.   Now, you indicated that he pulled over in front of a

10   closed business; is that correct?

11   A.   Yes, sir, that is correct.

12            THE COURT:  What business is that; do you know?

13            THE WITNESS:  It's a small corner market.  It's got

14   initials for a name.  I don't know --

15            THE COURT:  Wheeler.  Is Wheeler the street -- trying

16   to orient myself to this because I'm familiar with -- I go

17   down -- sometimes I go into Campbell County down 12th Street.

18            THE WITNESS:  Yes, sir.  If you're coming over the

19   12th Street bridge towards Covington, it's the very first left

20   before you kind of peel to the right.

21            THE COURT:  Okay.

22            THE WITNESS:  Wheeler, again, is a one-way street.

23            THE COURT:  Right.

24            THE WITNESS:  It's one block off of the Licking

25   River.

ULLRICH - Direct                                                    15

1          THE COURT:  Okay.  I think I know where that is.

2     Thank you.

3  BY MR. BRACKE:

4  Q.   At the point where he pulled over and stopped, had you

5  activated your emergency equipment at that point in time?

6  A.   No, sir, I had not.

7  Q.   You were just following him?

8  A.   Yes, sir.

9  Q.   How far did he travel, approximately, from where he

10 pulled out, made the turn to where he stopped?  How far had he

11 gone?

12 A.   Approximately three quarters to one block.

13 Q.   Not very far, from your experience?

14 A.   Yes, sir.

15 Q.   Is that kind of unusual, to be happening 1:24 in the

16 morning in this particular area of Covington, given that

17 visible reaction that you saw?  Is that driving pattern

18 unusual, from your experience?

19 A.   No, sir.  I found it -- yes, sir.  I found it unusual for

20 the length that he would drive.  That would be out of the

21 ordinary for me.

22 Q.   After making all those observations, what did you do?

23 A.   So at that time, I activated my emergency lights and

24 conducted the stop.  As I was exiting my vehicle, I finally

25 was able to read the license plate and give it to dispatch.

ULLRICH - Direct                                                    16

1          As I did that, I realized it was a temporary tag issued

2     by Ohio and that it had been expired.

3     Q.   What happened as you approached the vehicle?

4     A.   So I conduct a passenger side approach on a typical

5     traffic stop, as I did this evening.

6          When I walked up around the passenger rear wheel, I

7     illuminated the inside of the vehicle with my flashlight.

8     Mr. Jackson immediately told me that I didn't need to do all

9     that stuff.  I asked him what he meant.  He repeated it.

10         I kind of probed him further, because I thought it was

11    just unusual that I flashed my flashlight in his car to see if

12    there were people or any immediate threats that needed to be

13    addressed.  And he said, well, no, I was just talking to

14    myself, which stuck out to me as just an unusual interaction

15    at the initial beginning of the stop.

16         And then he assured me that there were, I believe, in his

17    words, no illicit drugs in his vehicle, which, again, was a

18    very unusual thing for him to say.

19    Q.   Had you even asked him any questions at that point in

20    time?

21    A.   No, sir.

22    Q.   So on his own, suddenly, he mentioned there's no drugs in

23    the car?

24    A.   Yes, sir.

25    Q.   And after he made that comment to you -- were you wearing

ULLRICH - Direct                                                    17

1   a body camera?

2   A.   Yes, sir, I was.

3   Q.   Did you notice anything about your body camera at that

4   point in time?

5   A.   Yes, sir.

6   Q.   What did you notice?

7   A.   We've recently moved over to the Axon body cameras.  It's

8   a company that used to be called Taser.  They're brand new

9   cameras for us, and they have some kinks that are being worked

10  out.

11       What is supposed to happen is when the lights to the

12  vehicle turn on, the cameras are supposed to be turned on

13  automatically.  As I approached the front passenger door, I

14  realized my camera was not on and had to turn it on manually.

15  Q.   Now, at that point in time, what did you -- what was your

16  next action that you took in this encounter?

17  A.   So my next step at that point is to identify myself and

18  the reason for the stop and then to gather his necessary

19  paperwork; his license, his registration, and insurance.

20  Q.   And what happened when you attempted to get his

21  registration and insurance?

22  A.   He had difficulty.  He was unable to find it, but he was

23  paging through paperwork, talking to me the whole time as he

24  was looking for it.

25  Q.   Now, are these documents that you need in order to do

ULLRICH - Direct                                                    18

1    your citation, to complete your traffic stop?

2    A.   Yes, sir, they are.

3    Q.   And he wasn't able to produce them for you?

4    A.   That's correct.

5    Q.   Was he looking for them during that interaction?

6    A.   He was.

7    Q.   You mentioned that initial comment about no illicit

8    drugs.  Were there any additional comments regarding drugs

9    during this next part of the encounter between the two of you?

10   A.   Several.  Yes, sir.

11   Q.   Give a paraphrase -- outline them for the Court.

12   A.   As he was attempting to locate his documents for me, he

13   again stated that I should not worry, that there were no

14   illicit drugs in his car.

15       I may have pointed out to him that I thought that was a

16   weird thing for him to say.  He stated that he worked for the

17   feds so I tried to figure out what exactly he meant by that.

18       He said he worked for Peter Lakes of the federal

19   government department.  I tried to elicit what department, in

20   fact, it was.  After some time, he finally said that Mr. Lakes

21   works for the DEA, but that it was classified and he couldn't

22   talk about it.

23       I asked him if there was any way I could contact

24   Mr. Lakes to verify what he was telling me, again finding it

25   very unusual for someone to come forward and begin to talk to

ULLRICH – Direct                                                          19

1   me about that kind of stuff in the middle of a regular traffic

2   stop.  He stated he did not have any way for me to be able to

3   contact to verify with Mr. Lakes and that he didn't think that

4   he was even allowed to talk to me about it.

5   Q.   And based on all these comments that you heard, did you

6   take any action with regard to backup at that point in time?

7   A.   Yes, sir.

8   Q.   What did you do?

9   A.   I requested that Specialist Lusardi respond with his K-9

10  partner to conduct a sniff of the vehicle.

11  Q.   Why did you do that?

12  A.   A totality of everything I'd seen put together; the

13  strong reaction to my presence, the immediate pull-off as soon

14  as I had passed him, reading it as an attempt to be further

15  away, put more space between myself and him, and then his

16  repeated statements about drugs being in the car.

17          THE COURT:  Not being.

18          THE WITNESS:  Not, correct; yes, sir.

19  BY MR. BRACKE:

20  Q.   And did Officer Lusardi respond?

21  A.   He did, sir.

22  Q.   Did you make a note in your report as to how long it took

23  from the time the stop was made to the time that Officer

24  Lusardi responded?

25  A.   Yes, sir.

ULLRICH - Direct                                                    20

1   Q.   How long was that?

2   A.   Per the dispatch log, which logs all the events on the

3   call in the computer, they stated it took nine minutes for

4   Officer Lusardi to come on scene after the initial stop began.

5   Q.   Is that consistent with your own recollection of the

6   events of the stop?

7   A.   Yes, sir.

8   Q.   Now, after receiving -- was the defendant ever able to

9   produce registration or insurance for you?

10  A.   No, sir.

11  Q.   Okay.  Did he produce identification for you?

12  A.   He did, sir.

13  Q.   What did you do with that identification?

14  A.   Once we figured out that he wasn't going to be able to

15  produce the insurance and the registration, I broke contact

16  with Mr. Jackson, I went back to my police car to run his

17  information, to verify that he had a valid driver's license,

18  and began my citation.

19  Q.   And were you still in the process of writing your

20  citation when Officer Lusardi responded?

21  A.   Yes, sir.

22  Q.   And in the process of running the defendant through

23  dispatch, what did you learn about him?

24  A.   Well, I ran him through my MDT computer there in the car,

25  and it came back with an NCIC indication that he was on

ULLRICH - Direct                                                          21

1    federal probation at that time.

2    Q.   Did you do any other --

3              THE COURT:  Which is, in fact, true.

4              MR. BRACKE:  Correct, Judge.

5    BY MR. BRACKE:

6    Q.   Did you do any additional checks through your computer to

7    get anything about his criminal history?

8    A.   Yes, sir.  So the NCIC from federal probation didn't

9    indicate -- or I couldn't find where it indicated what he was

10   on probation for.  So I checked his prior history through

11   Kentucky CourtNet for his arrest in Kenton County and found

12   that he had multiple arrests and convictions for drug

13   trafficking in Kenton County.

14   Q.   So you were aware of those convictions and that he was on

15   some sort of federal supervision, correct?

16   A.   Yes, sir.

17   Q.   What's the next step of what happened?

18   A.   As I was doing that paperwork, Officer Lusardi arrived,

19   and I stopped completing paperwork at that time to assist

20   Officer Lusardi in removing Mr. Jackson from the vehicle.

21   Q.   Why was that?

22   A.   The K-9 dogs that we have, they are dual purpose animals,

23   so they do tracking -- I know he has a better word for it, but

24   they bite and they do drug searches.  For the safety of

25   occupants, we remove people from the vehicles to prevent that.

ULLRICH – Direct                                                          22

1    Q.   It's not safe to run a dog through a car with occupants

2    inside; is that correct?

3    A.   That's correct, sir.

4    Q.   And from your observations, did Officer Lusardi use his

5    dog to check the car?

6    A.   Yes, sir.

7    Q.   Did you receive any indications from Officer Lusardi

8    about the results of that dog check?

9    A.   Yes, sir.  Officer Lusardi indicated to me that the K-9

10   had indicated on the presence of narcotics.

11            MR. ALERDING:  What was that response?  Indicated on

12   what?

13            THE WITNESS:  The presence of narcotics.

14            MR. ALERDING:  In the car?

15            THE WITNESS:  Yes, sir.  In or about the car.

16            MR. ALERDING:  Thank you.

17   BY MR. BRACKE:

18   Q.   And what was the defendant's demeanor like during this

19   series of events?  Did it stay the same?  Did it change?

20   A.   Mr. Jackson's demeanor throughout the contact continued

21   to increase in stress and anxiety.  Frequently during a stop,

22   as it's explained why a subject is stopped and how we will

23   proceed forward, their anxiety tends to lessen as they

24   understand what we're doing and why.

25       His anxiety only increased.  We had him at that point

ULLRICH - Direct                                                           23

1    seated on the curb back behind the car in a safe location.  He

2    began arguing about the legality of the stop and that I

3    couldn't have the K-9 respond, and he just -- he seemed

4    extremely agitated.

5    Q.   For record purposes, can you give the Court an overview

6    about the size of the defendant?

7    A.   He's about 6'5", 220 pounds.

8    Q.   What happened next?

9    A.   So once Officer Lusardi told me that the K-9 had

10   indicated, Officer Tipton, who had arrived shortly after the

11   stop began, and I had Mr. Jackson stand up so I could conduct

12   a search of Mr. Jackson's person.

13   Q.   Now, at this point in time, was he in handcuffs?

14   A.   No, sir, he was not.

15   Q.   Now, discuss -- talk about the search.  What do you

16   physically do with the defendant?  What kind of requests do

17   you make of him?  Describe the search to the Court.

18   A.   So, obviously, the first thing I have him do is stand

19   facing away from me, place his hands behind his back so I can

20   take control of his hands and begin the search.

21        As I did that, I could feel in his hands, as well as into

22   his shoulders, his body, he was very tense, and he kind of

23   kept leaning his body up against the vehicle that was parked

24   on the side of the road that we were nearest.  He was kind of

25   leaning into it, which was preventing the access to the front

ULLRICH - Direct                                                          24

1    of his body.

2        Feeling all of those things, I then asked him to spread

3    his feet so I could search him properly, and he was only able

4    to spread his feet about shoulder width apart.  I asked him

5    again.  He indicated that was as far as his feet went.

6        Finding all of that again suspicious and indicative that

7    he may have something on him, be preparing to run or fight, I

8    detained him in handcuffs at that point for safety purposes.

9    Q.  The search you talk about, when you ask somebody to

10   spread their legs for purpose of the search, is that something

11   you routinely do?

12   A.  Absolutely, sir.

13   Q.  From your experience, is it unusual for somebody to be

14   either unable or unwilling to spread their legs beyond

15   shoulder width?

16   A.  It would be unusual for that to occur, yes, sir.

17   Q.  What happened next?

18   A.  Once he was in handcuffs, I continued my search.  As I

19   went up through his groin area on the outside of his pants, I

20   located a large bulge, felt on it for a moment, felt that it

21   was clearly not part of his person, that it appeared to be a

22   baggie of what I suspected to be drugs, and I asked him about

23   it.

24   Q.  Was that something you -- was the nature of the item you

25   were feeling immediately apparent to you?

ULLRICH - Direct                                                    25

1    A.   Yes, sir.

2    Q.   Now, at that point in time, did you know what kind of

3    drugs it was?

4    A.   No, sir.

5    Q.   You just thought that, under all the circumstances you've

6    described, that this was drugs; is that correct?

7    A.   Absolutely, sir.

8    Q.   And based upon that immediate observation about the feel

9    of the item, what did you do at that point in time?

10   A.   I then attempted to retrieve it.  I had to undo

11   Mr. Jackson's belt and lower his zipper.  I then used my right

12   hand, I believe, to pull his pants straight out from his body

13   and stuck my hand down into his groin and was able to retrieve

14   the bag within a second or two.

15   Q.   Did his pants ever come down?

16   A.   No, sir.

17   Q.   Did his underwear ever come down?

18   A.   No, sir.

19   Q.   After you removed the item, what -- first of all, what

20   did you observe it to be?

21   A.   It was a latex glove, and it contained two large bags of

22   what I later identified as methamphetamine.

23   Q.   And this is the item that you felt on his person when you

24   patted down his groin area; is that correct?

25   A.   That's correct, sir.

ULLRICH - Direct                                                    26

1    Q.   Were his belt -- was his belt and zipper secured at that

2    point in time?

3    A.   I don't know if I immediately secured his belt and

4    zipper.  We kept his pants up, but I had to continue my

5    search.

6    Q.   So you continued your search?

7    A.   Yes, sir.

8    Q.   At any point in time, did his pants come down or his

9    underwear come down?

10   A.   No, sir, it did not.

11   Q.   After you completed the search of the groin area, was his

12   belt and zipper secured at that point in time?

13   A.   I believe at least his belt was, just to prevent his

14   pants from falling down.  At that point, he had to walk the

15   ten feet from my cruiser and sit down, and that was it.

16   Q.   After you found this particular item, you mentioned

17   securing him in your cruiser; is that correct?

18   A.   Yes, sir.

19   Q.   After finding the item itself, did you make any

20   statements about the defendant being arrested at that point in

21   time?

22   A.   Yes, sir.  I had not opened the glove yet, but seeing

23   that it was pretty apparently some sort of drugs, I told him

24   that he was under arrest at that time, and I Mirandized him.

25   Q.   And by "Mirandized him," what do you mean you did?

ULLRICH - Direct                                                    27

1    A.   I informed him that he had the right to remain silent,

2    that anything he said could be used against him; that he had

3    the right to have an attorney present during any and all

4    questioning and if he could not afford an attorney, one would

5    be appointed to him at no cost.

6    Q.   So after informing him of those things, the defendant was

7    then secured in your cruiser; is that correct?

8    A.   That's correct, sir.

9    Q.   After he was secured, did you return to the car and take

10   part in the search of the car?

11   A.   Yes, sir, I did.

12   Q.   Specifically, during the search of the car, did you find

13   anything of -- did you find anything worth -- discuss the

14   items that you found and seized through the search of the car?

15   A.   Yes, sir.   So Specialist Lusardi pointed out that there

16   was some loose marijuana on the driver's floorboard.   I

17   collected that.   And then underneath the driver's seat, there

18   was the lid to a digital scale.

19   Q.   Was that recovered as well?

20   A.   Yes, sir.

21   Q.   Now, this marijuana that was recovered out of the car, in

22   and of itself, that's an arrestable offense; is that correct?

23   A.   Yes, sir.

24   Q.   You mentioned the recording that was made in this

25   particular matter.   Have you reviewed what's marked for

ULLRICH - Direct                                                              28

1    identification as Government's Exhibit 1?

2    A.   Yes, sir, I have.

3    Q.   What's contained on that particular disk?

4    A.   It's body camera footage, sir.

5    Q.   Is it a true and accurate copy of the digital file

6    created during these events?

7    A.   Yes, it is.

8              MR. BRACKE:  Judge, we move the admission of

9    Government's Exhibit 1 at this time.

10             THE COURT:  Any objection?

11             MR. ALERDING:  Excuse me?

12             THE COURT:  Any objection to the admission of the

13   body cam?

14             MR. ALERDING:  No.

15             THE COURT:  Let it be received without objection.

16             MR. BRACKE:  Judge, we'd like to play certain

17   portions of it at this time.

18             THE COURT:  All right.  We'll admit the entirety of

19   it.

20             MR. BRACKE:  If there's any portion of it

21   Mr. Alerding wants to show, that's fine.  I don't know that

22   the whole thing is particularly relevant.

23        (A portion of Government's Exhibit 1 was played.)

24   BY MR. BRACKE:

25   Q.   Let me ask you a couple quick questions.  You indicated

ULLRICH - Direct                                                29

1    that you started the camera during your interaction; is that

2    correct?

3    A.   That's correct, sir.

4    Q.   Up in the right-hand corner, there is a time frame.  It

5    says 5:24:58.  Do you see that?

6    A.   Yes.

7    Q.   And then it has a Z after that.

8    A.   Yes, sir.

9    Q.   Is that the actual -- was it 5:24 in the morning?

10   A.   No, sir, it was not.

11   Q.   Okay.  Do you control what time is displayed on the

12   recording?

13   A.   No, sir.

14   Q.   To the best of your knowledge, is that a Zulu time or

15   Greenwich time?

16   A.   I believe it is, sir.

17          MR. BRACKE:  Go ahead.

18       (A portion of Government's Exhibit 1 was played.)

19          THE COURT:  At this point, are you by yourself?

20          THE WITNESS:  Officer Tipton is the flashlight on the

21   other side.  He was literally at the intersection when I

22   conducted the stop.

23          THE COURT:  All right.

24       (A portion of Government's Exhibit 1 was played.)

25          MR. BRACKE:  If you can stop it, and would you skip

ULLRICH - Direct                                                    30

1    ahead to where it reads 5:33:30, about four minutes.

2         (A portion of Government's Exhibit 1 was played.)

3              MR. BRACKE:  Stop right there.

4    BY MR. BRACKE:

5    Q.   The identification card you had, did that have the same

6    address of what he just verbally gave you?

7    A.   I don't believe it did, sir.

8    Q.   So you needed to get this accurate address so you could

9    do the citation?

10   A.   That's correct.

11             MR. BRACKE:  Please continue.

12        (A portion of Government's Exhibit 1 was played.)

13             THE COURT:  Do you mind stopping that for second.

14        While you're doing this, did you see a lot of people out

15   and about at whatever time it was, 1:30 a.m.?

16             THE WITNESS:  No, sir.  There were two or three or

17   four people, possibly.  I didn't notice -- I noticed one

18   person in particular who came up and spoke with myself and

19   Officer Lusardi at the conclusion of the stop, but I didn't

20   really notice anybody else.

21             THE COURT:  Was that before or after he was searched?

22             THE WITNESS:  It was after he was already in the

23   vehicle.

24             THE COURT:  Did you notice anybody around, either out

25   of your peripheral vision or your actual vision, that would

ULLRICH – Direct                                                      31

1    have been present when you were doing the patdown?

2              THE WITNESS:  No, sir.

3              THE COURT:  Okay.  Go ahead.

4              MR. BRACKE:  We haven't gotten to the patdown yet.

5              THE COURT:  I understand.

6              MR. BRACKE:  Go ahead.

7         (A portion of Government's Exhibit 1 was played.)

8              THE COURT:  Is this you in the vehicle now?  You're

9    in the cruiser?

10             THE WITNESS:  Yes, sir.

11             THE COURT:  And that's the little market you're

12   talking about there?

13             THE WITNESS:  Yes, sir, Z & K.

14             THE COURT:  Okay.  I know where that is.

15   BY MR. BRACKE:

16   Q.  The dog barking, whose dog was that?

17   A.  That's Specialist Lusardi.

18   Q.  So he's on scene at this time?

19   A.  Yes, sir.  He's at the driver's door explaining to

20   Mr. Jackson he's going to have him step out and run the dog.

21             MR. BRACKE:  Stop it for a second.

22   BY MR. BRACKE:

23   Q.  At this point in time, have you gotten the signal from

24   Officer Lusardi about the search?

25   A.  Yes, sir, I have.

1          MR. BRACKE:  Please continue.

2      (A portion of Government's Exhibit 1 was played.)

3          THE COURT:  That's not the vehicle he was driving,

4  correct?

5          THE WITNESS:  Correct.  That's just a car parked

6  along the street.

7          MR. BRACKE:  You can stop it.

8  BY MR. BRACKE:

9  Q.  The comment you made about a strip search being done at

10  the jail, from your training and experience, is that accurate?

11  A.  Absolutely, sir.

12  Q.  And after the defendant was secured, did you return to

13  the vehicle and take part in the search that located the

14  marijuana in the vehicle?

15  A.  Yes, sir.

16  Q.  And was that marijuana seized as well?

17  A.  It was.

18          MR. BRACKE:  No further questions.

19          THE COURT:  Cross-examination.

20                      CROSS-EXAMINATION

21  BY MR. ALERDING:

22  Q.  One part of this I found not to be accurate.  You kept

23  telling him he had nothing to worry about.  He's got something

24  to worry about, doesn't he?

25  A.  Well, he's trafficking drugs.  I would assume so, yes,

1    sir.

2    Q.   He was -- you were going southbound on Greenup -- or

3    Garrard?

4    A.   On Garrard, yes, sir.

5    Q.   He was parked going northbound?

6    A.   Correct.

7    Q.   How close to 13th Street?

8    A.   He was right at the corner, sir.

9    Q.   Right at the corner and pulled around the corner, so

10   that's about a hundred feet?  Because we got a picture of the

11   car right at the corner where you did all this work.

12   A.   The corner that the car is at is at 13th and Wheeler,

13   which is the next block down.

14   Q.   Oh, okay.  Now, when you went by, you said he looked at

15   you and gave you a look that caused you to be suspicious.

16   A.   Yes, sir.

17   Q.   Okay.  Isn't it a fact that you went down the street,

18   made a U-turn, came back, drove by him, made another U-turn

19   heading back down the street again.  And when he pulled out,

20   you came down the street backwards?

21   A.   No, sir.

22   Q.   What happens if -- let's just say I have a person who saw

23   this whole encounter and says you did that.  That would be

24   wrong?

25   A.   They would be lying.

ULLRICH - Cross                                                        34

1   Q.   They would be lying.  You didn't make two U-turns and

2   come back down the street?

3   A.   No, sir.

4   Q.   Okay.  So you're saying as you're going southbound, he

5   pulls away from the curb going northbound, and you could see

6   he didn't put on a signal?

7   A.   That's correct.

8   Q.   You're going the opposite direction?

9   A.   Yes, sir.

10  Q.   And you could see that how?

11  A.   My car is outfitted with mirrors.

12  Q.   And you were looking at your mirror while you were

13  driving, getting ready to take a U-turn.  You had to make a

14  U-turn to come back and pursue him, right?

15  A.   I did.

16  Q.   Okay.  And you saw him violate this law while going in

17  the opposite direction?

18  A.   Yes, sir.

19  Q.   Okay.  Now, I read the citation, and it says these

20  things.

21           THE COURT:  Will you make that part of the record?

22  Because it's not part of the record, the citation.

23           MR. ALERDING:  I'd be glad to.

24           THE COURT:  If you're going to make reference to it,

25  it might be a good idea to have it.  Do you want to make that

ULLRICH - Cross                                                    35

1    Defense Exhibit 1?

2              MR. ALERDING:  I will.

3              THE COURT:  Any objection?

4              MR. BRACKE:  No objection.

5              MR. ALERDING:  I've lost my glasses and am using

6    these, and I hope I can read.  I finally have to use glasses

7    at 76.

8              THE COURT:  I used them at 50.  We'll mark it after

9    the hearing.  It will be admitted as Exhibit 1.

10             MR. ALERDING:  Thank you, sir.

11   BY MR. ALERDING:

12   Q.  It says, "was observed failing to signal as he entered

13   from a parked position on Garrard and 13th and then failed to

14   signal at the corner of northbound at Garrard and 13th." (As

15   read)

16       Is that all correct?

17             THE WITNESS:  That is, sir.

18   BY MR. ALERDING:

19   Q.  "The vehicle has a temporary license plate and Sergeant

20   Lusardi responded with a K-9, which indicated drugs --

21   indicated on the vehicle." (As read)

22       Now, how many times do you get the drug dog for a guy who

23   commits the very serious offense of not putting on his signal

24   to pull out from the curb?

25   A.  That's not why I requested Specialist Lusardi respond.

1    Q.   Well, I understand, but how many times do you do that?

2    A.   I don't keep track of those records.

3    Q.   You don't do it every time, do you?

4    A.   Certainly not.

5    Q.   Probably wouldn't do it for me, would you?

6    A.   It depends on the day.

7    Q.   Okay.  Now, at 1:24 in the morning, there wasn't any

8    traffic there, was there?  Anybody he interfered with when he

9    pulled out from the curb?

10   A.   Other than my vehicle, no, I don't believe there was

11   another car there.

12   Q.   Now, you brought the drug dog, and he alerted on this

13   car, and then the citation goes on to say he's charged with

14   trafficking and possession of marijuana.

15       Is it a fair statement to say you found the marijuana

16   after you placed him under arrest for the drugs that were in

17   his underwear?

18   A.   Well, I certainly recovered the marijuana after that.

19   However, while I was conducting the search of Mr. Jackson,

20   Specialist Lusardi was conducting the search of the vehicle

21   starting at the driver's door, and he found the loose

22   marijuana almost immediately.  So I don't exactly know which

23   was found first.

24   Q.   Is 13th and Garrard a high crime area when there aren't

25   many people out and it's 1:30 in the morning?

ULLRICH - Cross                                                    37

1    A.   I've responded to three shootings there, sir.

2    Q.   That night?

3    A.   Not that night, no.

4    Q.   Okay.  So it -- that's probably where you just drive

5    around every night, isn't it?

6    A.   It is not.

7    Q.   It's not?

8    A.   No, sir.

9    Q.   Okay.  Now, did your perception of the defendant change

10   after you ran his record?

11   A.   No, I don't believe it changed.

12   Q.   I mean, you told him, I know you're on federal probation.

13   I know you're a drug trafficker.  I know you've got prior

14   convictions.

15       You didn't know any of that when you pulled him over for

16   a turn signal, did you?

17   A.   Certainly not.

18   Q.   And are you supposed to consider those things when you're

19   determining if a person is suspicious, such that you might

20   need to search this guy?

21   A.   I had already obviously requested Specialist Lusardi

22   respond at that point, and I had already determined well

23   before I ran his information that I found him to be

24   suspicious.

25   Q.   Well, let me ask you a question.  What evidence were you

*ULLRICH - Cross*                                                    38

1   hoping to find that would prove he was guilty of not using a

2   turn signal?

3   A.   I was not looking for evidence of that.

4   Q.   Well, are you familiar -- I guess you get trained about

5   what are the parameters of searches, don't you?

6   A.   Certainly.

7   Q.   Have you ever been reprimanded for violating the protocol

8   of your searches?  Are you under a reprimand for that?

9   A.   For violating protocol of searches?

10  Q.   Yeah.  You did something -- your personnel file reflects

11  some kind of a reprimand or something that you did improper

12  involving the arrest or search of a particular individual,

13  doesn't it?

14  A.   Not to my recollection.  I don't know what it is you

15  speak of.

16  Q.   I'll mention it in the proper time.

17       THE COURT:  Now would be the proper time.  What's the

18  proper time?  I denied your motion to get his records.

19       MR. ALERDING:  I understand.

20  BY MR. ALERDING:

21  Q.   I was alerted to the fact --

22       THE COURT:  By whom?

23       MR. ALERDING:  The circuit court judge of Kenton

24  County.

25       THE COURT:  Okay.

ULLRICH - Cross                                                          39

BY MR. ALERDING:

Q.   -- that in a trial just last week, in the James Pearson

case, evidence came out that you testified to "A" at one trial

and the absolute opposite of "B at the second trial.  Is that

true?

     About searching a bag.  Yes, I had permission.  No, I

didn't have permission.  Did you say that?

A.   There was some conflicting testimony for that case, yes,

sir.

Q.   From you?

A.   It's not in my personnel file, by any means.

Q.   I understand that, but a question was also asked do you

have any reprimands in your record involving searches or

misconduct, and the answer was yes, wasn't it?

A.   Well, that's a different question, sir.

Q.   Okay.  Let's say I phrased the question properly.  I'm

asking you the same thing they asked you in which you said

yes.

A.   Your question was were there any reprimands specific to

search of persons incident to an arrest, as opposed to search

of persons or any misconduct.

Q.   Okay.  What's the misconduct?

A.   I've had reprimands for report writing issues related to

clerical errors.  I was written up once for not writing "ST"

at the end of street on a particular citation.  A lot of small

ULLRICH - Cross                                                          40

1    issues like that.

2    Q.   Well, generally speaking, these KYIBRS reports and these

3    citations are your first recollection of what the devil you

4    did at the time you did this, right?  So it's kind of

5    important, what you write down, isn't it?

6    A.   It is important what's written down.

7    Q.   And you want it to be accurate?

8    A.   I do.

9    Q.   You want it to be true?

10   A.   Yes, sir.

11   Q.   And you want it to be subject to examination as to

12   whether it's accurate and true?

13   A.   Yes, sir.

14   Q.   Okay.  Now, I'm sure with your training, you know what a

15   Terry stop is?

16   A.   Yes, sir.

17   Q.   How many times did you conduct a Terry patdown on

18   Mr. Jackson?

19   A.   I conducted no Terry patdown on Mr. Jackson.

20   Q.   Did you see the officer when he was standing next to his

21   car in the video patting him down before you ever got to him?

22   A.   Before --

23   Q.   It's right on the video at 5 --

24   A.   Before I got to him?  I'm confused by the wording of your

25   question, sir.

1          THE COURT:  If you want to bring up a particular time

2     on the video, I'm sure Rich will bring it up.

3          MR. ALERDING:  5:35.

4          MR. BRACKE:  Judge, we'll stipulate Officer Lusardi

5     did a patdown when he removed him.

6          THE COURT:  Is that your question?

7          MR. ALERDING:  What?

8          THE COURT:  They're stipulating Lusardi did a quick

9     patdown when he removed him from the vehicle so he could

10    conduct the K-9 search.

11         MR. ALERDING:  Exactly.

12    BY MR. ALERDING:

13    Q.   Now, when he did that patdown, did he tell you he felt a

14    bulge in the groin area that you later said, by doing your

15    little patdown, you felt that?

16    A.   No, sir, he did not.

17    Q.   Okay.  So you did more than just pat him down for weapons

18    or a bulge in his pants, in his pockets?

19    A.   Correct.  I was searching him at that point for drugs.

20    Q.   Okay.  So you admit you were doing a search, and you had

21    just said to him, Sir, you're not under arrest.  I saw it.  I

22    heard you say it.

23    A.   That's correct.

24    Q.   And at the same time you're saying that, you put

25    handcuffs on him?

1    A.   I did.

2    Q.   At what point was he not under arrest if you put

3    handcuffs on him and were afraid he was going to flee?  I

4    heard you say that, didn't want him to run away.

5    A.   I think what I said is bad things may happen, because the

6    indicators he was giving me, it just increased our safety to

7    secure him in handcuffs at that point.  But handcuffs come off

8    just as easily as they go on, sir.

9    Q.   Well, apparently, he knows something about search and

10   seizure law and getting pulled over for a traffic stop because

11   he told you, All you're supposed to do is give me a ticket.

12   Did he say that to you?

13   A.   He did.

14   Q.   And if he had a valid license, which is an arrestable

15   offense, so you couldn't arrest him for that, the other two

16   are not arrestable offenses within the meaning of the

17   Covington police handbook, correct?

18   A.   Which other two?

19   Q.   No insurance and expired license plate.  Those are just

20   citable offenses, aren't they?

21   A.   Correct.  Those are just traffic tickets.

22   Q.   Okay.  And he said, Let's get on with this.  Give me a

23   citation.  But that wasn't good enough for you, was it?

24   A.   No.

25   Q.   To write out a ticket?  You said, We won't worry about

ULLRICH - Cross                                                    43

1    that right now.  I'm trying to figure out what you're doing

2    here.

3         What's the difference what he's doing there?  Did you

4    think he was going to say he's there to murder someone?

5              MR. BRACKE:  Objection.

6    Q.   He can be there for any legitimate reason.

7              THE COURT:  Sustained.

8              MR. ALERDING:  Okay.

9    BY MR. ALERDING:

10   Q.   You said that it's protocol to come around to the

11   passenger side; is that right?

12   A.   I didn't say it was protocol.  I said that's what I do.

13   It's a far safer approach to vehicles.

14   Q.   Then after you got this information from him, I saw you

15   come back to the driver's side.  So which is it?  Driver or

16   passenger or what?

17   A.   I approached the vehicle on the passenger side.  I then

18   broke contact with him.  I returned to my vehicle.  Then to

19   confirm his new address, I walked back up to the driver's

20   side.  Officer Tipton had been standing there at that point so

21   there was no issue of an immediate safety concern because he

22   had been observed that whole time.

23        And then when I reapproached again, once Officer Lusardi

24   responded, I once again was on the passenger side.

25   Q.   Did you have the opportunity to watch the video as we

*ULLRICH - Cross*                                                    44

1    played it?

2    A.   Yes, sir.

3    Q.   At 5:35:38, did you see the people hanging out the window

4    watching this, people that you said weren't around?

5    A.   I didn't notice anyone hanging out the window.

6          THE COURT:  Did we see them on the video?  I'd like

7    to see it if you saw it.

8          MR. ALERDING:  I saw it.  5:35:38, you can see the

9    woman hanging out the window.

10       There, right there.  See her sticking her head out the

11   window?  Second floor.  Second window over.

12         THE COURT:  Is that a person who is going to be

13   testifying?

14         MR. ALERDING:  No.  I haven't located her yet.  And

15   there's a person looking out the window on the first floor,

16   first window.

17         THE COURT:  Are these the witnesses who are going to

18   say there's a strip search?

19         MR. ALERDING:  No.  I've got other witnesses.  This

20   is just to show that there was more than just a few people

21   present when he did this.

22         THE COURT:  Okay.  There's two there.

23         MR. ALERDING:  Okay.

24         THE COURT:  Assuming those are people, that's two.

25   ///

ULLRICH – Cross                                                    45

1   BY MR. ALERDING:

2   Q.   Now, at 5:37:32, you said you're not under arrest.  And

3   at 5:38, you put the handcuffs on him.  So when did you

4   formulate the impression that he was under arrest?

5   A.   When I pulled an ounce of methamphetamine out of his

6   underwear.

7   Q.   No, no, no.  You found that after you handcuffed him.

8   A.   That's correct.

9           MR. BRACKE:  Objection.  He's answered the question.

10          MR. ALERDING:  Yeah, but he answered it wrong.

11          MR. BRACKE:  That's not for Mr. Alerding to decide.

12          THE COURT:  That would be correct.

13          MR. ALERDING:  What would be correct?

14          THE COURT:  That it's not for you to decide if he

15  answered it wrong.  I mean, I can watch the video.  I can

16  watch the video from a time perspective, what was said.  If he

17  testifies differently than what's on the video, the video is

18  probably a little bit more accurate.

19          MR. ALERDING:  I'm certain that you will.

20  BY MR. ALERDING:

21  Q.   Okay.  Well, I'm now looking at the KYIBRS report that

22  you wrote up that night.  Don't you guys write these up right

23  afterward so they're fresh in your mind?

24  A.   They're typically written in the same day of service, but

25  not usually for me right after.

1    Q.   In the middle of the paragraph, you said, "Sergeant

2    Lusardi arrived nine minutes after the initial stop.  I began

3    to search Mr. Jackson, who was very nervous.  I asked him to

4    spread his feet.  He spread his feet and wouldn't spread them

5    further.  I detained him in handcuffs at that time." (As read)

6         So you had started searching him before you handcuffed

7    and when you told him he wasn't under arrest; is that right?

8              MR. BRACKE:  Judge, for the record, this is

9    Government's Exhibit 5.  I'm tendering it to the officer.

10   It's the document Mr. Alerding is reading from.  If he's going

11   to read from it, I think we should have it in the record.

12   We'd move the admission of Government's Exhibit 5.

13             THE COURT:  Any objection?

14             MR. ALERDING:  No.

15             THE COURT:  Let it be received without objection,

16   Government's Exhibit 5.

17        What is it called?

18             MR. ALERDING:  KYIBRS report.

19             MR. BRACKE:  It's a police report, narrative

20   statement.

21             THE COURT:  Narrative statement, KYIBRS report.

22        Very well.

23             MR. ALERDING:  Thank you.  No other questions.

24             THE COURT:  Redirect, Mr. Bracke?

25             MR. ALERDING:  Oh, I'm sorry.  One other question.

*ULLRICH - Redirect*                                                          47

1    BY MR. ALERDING:

2    Q.   When this whole case came to me, I was led to believe

3    that you had arrested this fellow for marijuana possession

4    before you conducted the search of his underwear.  Is that

5    accurate or is that not true?

6    A.   No, sir.  I initially told him he was under arrest when I

7    found the methamphetamine.  I was unaware of the marijuana at

8    that time.

9         MR. ALERDING:  That would make a big difference,

10   Judge, if he was under arrest for marijuana.  That's my point.

11        THE COURT:  The arrest -- well, go ahead.  Go ahead.

12   I'm not going to make any statements.  We'll decide later.

13      Go ahead.

14                        REDIRECT EXAMINATION

15   BY MR. BRACKE:

16   Q.   You hadn't seized the marijuana at that point in time,

17   correct?

18   A.   Correct.

19   Q.   You received notice, though, from Officer Lusardi about

20   the drug hit; is that correct?

21   A.   That's correct, sir.

22   Q.   Mr. Alerding asked you questions about your background,

23   about the times you've been written up.

24      For the interest of completion, I just want to show you

25   what's marked as Government's Exhibit 4.  Mr. Alerding's got a

*ULLRICH – Redirect*                                                                    48

1    copy of it.  It's the CV.

2            MR. ALERDING:  What's that?

3            MR. BRACKE:  Officer Ullrich's CV.  I'll tender that

4    to the witness.

5            THE COURT:  Would you like to admit that?

6            MR. BRACKE:  Yes.

7            THE COURT:  Any objection?

8            MR. ALERDING:  No.

9            THE COURT:  Government's Exhibit 4, his CV, is

10   admitted without objection.

11   BY MR. BRACKE:

12   Q.  Is this a true and accurate statement of your curriculum,

13   your educational background, your certifications, your

14   training that you've received, your awards that you've

15   received?

16   A.  Yes, sir.  I've had some additional training since then.

17   This is dated October of 2017.  I've had a small amount of

18   training since then.

19   Q.  That's fine.  I'm not even going to ask you about it.

20   It's in the record.  The Court can have the opportunity to

21   review it.

22            MR. BRACKE:  No further questions.

23            THE COURT:  You may step down.  Thank you.

24            THE WITNESS:  Thank you, sir.

25            THE COURT:  Next witness.

1          MR. BRACKE:  Tyler Tipton.

2       Judge, for purposes of this hearing, Officer Ullrich is

3    assisting me.  I'd ask he be able to remain at the table

4    during other witness testimony.

5          THE COURT:  Very well.  Rule 615 allows that.

6           TYLER TIPTON, GOVERNMENT'S WITNESS, SWORN

7          THE COURT:  Good afternoon.

8          THE WITNESS:  Good afternoon, sir.

9          THE COURT:  You may proceed.

10                        DIRECT EXAMINATION

11   BY MR. BRACKE:

12   Q.  Would you identify yourself and spell your last name for

13   the record.

14   A.  Officer Tyler Tipton with the Covington Police

15   Department.  T-i-p-t-o-n.

16   Q.  Thank you.  How long have you been in law enforcement?

17   A.  Almost two years.

18   Q.  And how long -- has all that time been with Covington?

19   A.  Yes, sir.

20   Q.  Let me ask you about October 4 of 2017.  What was your

21   assignment that day?

22   A.  I believe I was running the east side of Covington.

23   Q.  And when had you finished your field training operations?

24   A.  In July of 2017.

25   Q.  So this is about two and a half, three months later; is

1    that correct?

2    A.   Yes, sir.

3    Q.   And let me direct your attention to about 1:24 in the

4    morning on October 4, 2017.  Did you have occasion to respond

5    to a call at that time?

6    A.   I did.

7    Q.   Okay.  What happened when you responded to the call?

8    What did you see?

9    A.   I believe I backed up on a traffic stop for Officer

10   Ullrich.  He was coming eastbound towards me.  I was facing

11   westbound on East 13th Street.  I believed him to be pulling

12   over a vehicle, which he did.

13   Q.   And did you respond to back him up during this stop?

14   A.   Yes, I did.

15   Q.   During your time backing him up, did you approach the

16   vehicle?

17   A.   I did.

18   Q.   What, if anything, did you observe about the occupant of

19   the vehicle?

20   A.   His behavior was a little abnormal from a day-to-day,

21   routine traffic stop.

22   Q.   What was abnormal about it?

23   A.   He was speaking about how he's a DEA agent, and officers

24   don't need to ask him certain questions, and his body behavior

25   just wasn't normal.

TIPTON - Direct                                                          51

1   Q.   At some point in time, did another officer respond during

2   the call as well?

3   A.   Yes.

4   Q.   And what happened when the other officer responded?

5   A.   I believe Officer Lusardi responded with his K-9 partner,

6   and we had the driver step out of the vehicle.  At that point,

7   the dog went around the vehicle for a narcotics investigation.

8   Q.   After the drug dog went around the vehicle, were you

9   present, near Officer Ullrich and the defendant?

10  A.   Yes.

11  Q.   At that point in time, how many people were in the

12  vicinity that you could see?

13  A.   Around three, possibly.

14  Q.   And how far away were they from where the defendant was?

15  A.   50 or 60 feet.

16  Q.   Were you present when Officer Ullrich performed the

17  search of the defendant?

18  A.   Yes, I was.  I -- yes, sir.

19  Q.   How close were you?

20  A.   Within arm's reach.

21  Q.   Describe what happened.

22  A.   Officer Ullrich asked the defendant to spread his feet,

23  at which point he didn't refuse, but he didn't spread them a

24  normal width apart.  When asked to spread them farther, he

25  said, It's as far as I can spread them.  I believe they were a

TIPTON – Direct                                                    52

1    little over shoulder width apart at that point.

2        Officer Ullrich began searching the defendant and feels

3    something abnormal in the groin area.  When he asked what it

4    was, he said that was his genitals.

5    Q.  What happened next?

6    A.  Officer Ullrich undid his belt, lifted his waistband

7    outward, retrieved the item that he believed to not belong in

8    there, and then pulled it out.

9    Q.  Did the defendant's pants come down?

10   A.  No.

11   Q.  Did his underwear come down?

12   A.  No, sir.

13   Q.  Was he completely covered during this time?

14   A.  Absolutely.  Yes, sir.

15   Q.  Did you have a chance to see the item that Officer

16   Ullrich recovered from the defendant's groin area?

17   A.  Yes, I did, sir.

18   Q.  Can you give a general description of it?

19   A.  I believe it was a nitro glove with a bunch of white or

20   clear salt-looking material.

21   Q.  From your training and experience, did it look like a

22   controlled substance?

23   A.  Methamphetamine, yes.

24   Q.  Sorry.  What?

25   A.  Looked like methamphetamine.

TIPTON - Redirect                                                          53

1   Q.   After that item was found, did Officer Ullrich inform the

2   defendant of his rights?

3   A.   Yes, sir.

4   Q.   Did he secure him in his vehicle?

5   A.   Yes, sir.

6            MR. BRACKE:  No further questions.

7            THE COURT:  Cross.

8                        CROSS-EXAMINATION

9   BY MR. ALERDING:

10  Q.   Did you conduct any kind of a patdown *Terry* search of

11  this defendant?

12  A.   I don't recall if I did, sir.  I believe it was Officer

13  Lusardi.

14  Q.   You didn't do one?

15  A.   I don't believe so.

16  Q.   But you saw Officer Lusardi pat him down?

17  A.   When he got out of the vehicle, yes, sir, we always pat

18  down for weapons.

19           MR. ALERDING:  Okay.  Thanks.

20           THE COURT:  Anything else?

21           MR. BRACKE:  Judge, I do think I want to show just a

22  small portion of his video.

23                       REDIRECT EXAMINATION

24  BY MR. BRACKE:

25  Q.   When you came up, I handed you a document marked

*TIPTON - Redirect*                                                    54

1    Government's Exhibit 3.  Do you have that item?

2    A.   I do, sir.

3    Q.   Have you reviewed that disk before coming in here today?

4    A.   Yes, sir.

5    Q.   What's on that disk?

6    A.   My signature and the date and time.

7    Q.   What's the footage?

8    A.   It's my body cam from the night.

9    Q.   From this particular night?

10   A.   Yes.

11   Q.   Is it a true and accurate copy of your footage?

12   A.   Yes, it is.

13            MR. BRACKE:  Move admission of Government's

14   Exhibit 3.

15            THE COURT:  Any objection to 3?

16            MR. ALERDING:  No, sir.

17            THE COURT:  Let it be received, Officer Tipton's body

18   cam video.

19            MR. BRACKE:  If I could have that back, I think he

20   has a different angle of the search.  I want to show that

21   portion.  Mr. Alerding can show any portion he wants.

22       Mr. Walters, once you get it in, if you would go 14:46

23   into the video, that our starting point.  The actual time read

24   at the top would be 5:37:25.  It's 14 minutes, 46 seconds from

25   the start.

1          THE COURT:  We're looking at the defendant's vehicle

2     right here?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  All right.

5          MR. BRACKE:  We can start there.

6       (A portion of Government's Exhibit 3 was played.)

7          MR. BRACKE:  You can stop it.

8     BY MR. BRACKE:

9     Q.   Is that a true and accurate copy of those events?

10    A.   Yes, it is, sir.

11         MR. BRACKE:  No further questions.

12         THE COURT:  Any recross?

13         MR. ALERDING:  I don't have any other questions of

14    this witness, Judge.

15         THE COURT:  Very well.

16         MR. BRACKE:  Thank you.

17       United States calls Mike Lusardi.

18         THE COURT:  Okay.

19         MIKE LUSARDI, GOVERNMENT'S WITNESS, SWORN

20         THE COURT:  Good afternoon.

21         THE WITNESS:  Hi.

22         THE COURT:  You may proceed.

23                      DIRECT EXAMINATION

24    BY MR. BRACKE:

25    Q.   Would you identify yourself and spell your last name for

LUSARDI - Direct                                                    56

1   the record, sir.

2   A.   Mike Lusardi, L-u-s-a-r-d-i.

3   Q.   For record purposes, I handed you as you walked up a

4   document marked -- a disk marked Government's Exhibit 2.  Can

5   you identify that item?

6   A.   It is a CD/video of my body camera.

7   Q.   And is this from October 4, 2017, events involving

8   Mr. Rodney Jackson?

9   A.   Yes.

10  Q.   Have you reviewed that to make sure it's a true and

11  accurate copy of your body camera?

12  A.   Yes.

13          MR. BRACKE:  Move admission of Government's

14  Exhibit 2.

15          THE COURT:  Without objection?

16          MR. ALERDING:  No objection.

17          THE COURT:  All right.  Let it be received.

18  BY MR. BRACKE:

19  Q.   How long have you been a police officer, sir?

20  A.   Fourteen years.

21  Q.   And what was your assignment on October 4 of 2017?

22  A.   Patrol, K-9 unit.

23  Q.   And who was your dog on that particular day?

24  A.   PSD Ernie.  I don't know his -- I know his full name, but

25  I just can't pronounce it.

LUSARDI - Direct                                          57

1    Q.   Ernie.  We'll stick with Ernie.

2    A.   Thank you.

3    Q.   Can you outline, just give us an overview of areas where

4    Ernie has had specialized training?

5    A.   He is a narcotics dual purpose K-9 so he does all

6    commands as far as protection work, tracking, building

7    searches, narcotics.  Goes from vehicles to open area, rooms,

8    lockers.

9    Q.   So specifically, he's been trained to detect controlled

10   substances; is that correct?

11   A.   Correct.

12   Q.   Is methamphetamine one of the substances he's trained to

13   detect?

14   A.   Yes.

15   Q.   Based on your -- how long have you had -- as of October

16   of 2017, how long had you been working with Ernie?

17   A.   Since 2012 is -- yeah, roughly 2012.  I got him

18   nationally certified through --

19   Q.   And did you renew that certification every year?

20   A.   Yes.

21   Q.   From your times working with Ernie, has he consistently

22   been able to find, detect the odors of controlled substances?

23   A.   Yes.

24   Q.   How many times have you used Ernie to search areas?

25   A.   Oh, it's a lot.  I don't know.  I would say over a

LUSARDI - Direct                                                    58

1    thousand, 1,500.

2    Q.   Based on your experience working with Ernie, when he's

3    given you a positive indication for the odor of controlled

4    substances, have you consistently found either drugs or drug

5    paraphernalia?

6    A.   Yes.

7    Q.   Let me direct your attention to about 1:30 in the morning

8    on October 4, 2017.  Did you have occasion to get called to a

9    stop at that point in time?

10   A.   I did.

11   Q.   Where did you respond, sir?

12   A.   13th and Wheeler.

13   Q.   And who summoned you to the area?

14   A.   One of the officers on scene there.  I don't remember if

15   it was Officer Ullrich or Tipton.

16   Q.   And what did you do when you responded to the area?

17   A.   I was -- I came down Wheeler and stopped there at 13th

18   and then basically just got out of my cruiser.  Basically, I

19   just walked up to the vehicle and asked him -- or told him who

20   I was.  And I asked him to step out of the vehicle, patted him

21   down for weapons, passed him back to the officers.

22        I deployed my K-9, Ernie, on a six-foot leash, and we

23   started at the front of the vehicle.  We did an ambient air

24   scan around the vehicle.  And on the second scan, he did

25   indicate on the driver's door.

LUSARDI - Direct                                                          59

1        Then I put him up and searched the vehicle.

2   Q.   Now, were you summoned to the scene for the purpose of

3   performing a check on this car?

4   A.   Yes.

5   Q.   And why did you have the defendant removed from the car?

6   A.   He's a dual purpose dog.  It's for his safety and mine so

7   he does not get bit.  Also, it's officer safety as well.  High

8   crime, high narcotic area.  Drugs and guns.

9   Q.   Now, you indicated that the dog alerted on the driver's

10  side door; is that correct?

11  A.   Yes.

12  Q.   How does he -- what does he physically do to alert on

13  that area?

14  A.   So a change of behavior as far as what I look for.

15  Because he's a source dog, he will do everything he can to get

16  to source.  To minimize damage to the vehicle, his body

17  posture, his ears, his deep breathing, his head hooks, and

18  even trying to jump through the window is what I'm looking

19  for.

20       If I continue to let him go in, he will damage the

21  vehicle, jump through the window and, you know, go to source,

22  wherever the narcotics may be.

23  Q.   So what do you do to prevent that from happening?

24  A.   Basically, I look for his changes, his different

25  breathing, the way he's moving, his posture.  Also, his head

LUSARDI - Direct                                                        60

1    hooks when he's walking by the door, his tail, stuff like

2    that.

3    Q.   Now, from your working with Ernie over the past five

4    years, are you able to observe those things quickly?

5    A.   Yes.

6    Q.   Is it important for you to see those things as they

7    happen?

8    A.   Yes.

9    Q.   And that's to prevent damage to the car or danger to the

10   dog; is that right?

11   A.   Correct.

12   Q.   Now, if somebody's not trained, can they see the same

13   things in Ernie's behavior that you can see?

14   A.   No.

15   Q.   In this particular case, you observed him indicate for

16   that -- in that area; is that correct?

17   A.   Yes.

18   Q.   In fact, did you perform a search of that particular area

19   where he indicated?

20   A.   I did.

21   Q.   And what did you find in the area he indicated?

22   A.   Underneath the driver's seat was a bag of marijuana.

23   Q.   Was that ultimately seized?

24   A.   Yes.

25   Q.   When the dog alerted on the driver's side door, did you

LUSARDI - Cross                                                        61

1    pass that information on to Officer Ullrich?

2    A.   I did.

3              MR. BRACKE:  No further questions.

4              THE COURT:  Cross-examination.

5                          CROSS-EXAMINATION

6    BY MR. ALERDING:

7    Q.   You could be called to any scene an officer requests the

8    drug dog, for any offense?

9    A.   Yes.

10   Q.   Does that dog alert in different ways for different

11   drugs?

12   A.   No.

13   Q.   Okay.  I thought maybe the dog could distinguish

14   marijuana versus methamphetamine or something by barking or

15   scratching or something.  He alerts the same way?

16   A.   Yes.

17   Q.   Okay.  Now, let's just say I was driving around in my car

18   and I had a pound of marijuana in my car.  A week later, when

19   I don't have that pound of marijuana in my car, could your dog

20   alert on my car and smell that marijuana?

21   A.   Yes.

22   Q.   So sometimes dogs alert on cars and there are no drugs in

23   the cars; is that true?

24   A.   Yes.  It's called --

25   Q.   And a dog alerts 100 percent of the time --

*LUSARDI - Cross*                                                              62

1          THE COURT:  Hold on.  It's called what?

2          THE WITNESS:  Residual odor.

3     BY MR. ALERDING:

4     Q.   A dog alerts 100 percent of the time to the scenes they

5     ask you to come, don't they?

6     A.   My dog, I would say -- I can't testify to anybody else's

7     dog, but mine has a high rating.

8     Q.   Of course he does.  You're in a high crime area with low

9     income area where people smoke weed.  They're going to alert

10    100 percent of the time.

11    A.   Again, it's --

12    Q.   So how does that make it --

13    A.   I'm --

14         MR. BRACKE:  Objection.  He's not letting the witness

15    finish the answer.

16         THE COURT:  If he alerts, he alerts.  The case law

17    says what it says.  If they alert because someone's smoking

18    weed in a low income area, I mean, the case law still says

19    that that makes certain things permissible after the positive

20    hit.

21         Now, if someone had been smoking dope at that street

22    corner five minutes before and some of the waft of the cush

23    smell got into the car, maybe that's what he alerted on.  It

24    has a result.  The resulting impact is a positive drug hit

25    allows the police to do certain things.

LUSARDI - Cross                                                        63

1    BY MR. ALERDING:

2    Q.   Did you take the dog to the defendant?

3    A.   What's that?

4    Q.   Did you run the dog around the defendant?

5    A.   No.

6    Q.   So you don't know if he would have alerted?

7    A.   He would have bit him.  We don't do people.

8    Q.   You don't do people?

9    A.   No.

10   Q.   You only do -- well, he walked by the defendant, didn't

11   he?  If you walk by a defendant that's got an ounce of --

12   A.   If I brought my dog to your defendant, he would bite him.

13            THE COURT:  Aren't there some --

14   Q.   I didn't say --

15            THE COURT:  Hold on.  Let me ask a question.

16       Aren't there some passive dogs that will sit when they

17   react to the presence of a narcotic odor, versus go to the

18   source?

19            THE WITNESS:  Yes.  It depends on how strong that

20   odor is coming out.

21            THE COURT:  I've had other K-9 handlers testify in

22   other cases where their dog's alert is to sit down.

23            THE WITNESS:  Correct.

24            THE COURT:  And they can actually walk around people

25   without having this biting type situation.

BRYANT - Direct                                                        64

1           THE WITNESS:  Right.  More paperwork.

2           THE COURT:  Okay.  Go ahead.

3    BY MR. ALERDING:

4    Q.   The dog, I guess, had a pretty good sniffer.  They don't

5    have to be right up against a person to smell it, do they?

6    A.   Again, we don't train -- I've never done people in the

7    ten years I've been a K-9.

8           MR. ALERDING:  Okay.  Thanks.

9           THE COURT:  Any redirect?

10          MR. BRACKE:  No, sir.

11          THE COURT:  You may step down.  Any further proof?

12          MR. BRACKE:  We rest.

13          THE COURT:  Mr. Alerding, you may call your

14   witnesses.

15          MR. ALERDING:  I'm ready.  I'd like to call Michael

16   Bryant first.

17          THE COURT:  All right.

18             MICHAEL BRYANT, DEFENSE WITNESS, SWORN

19          THE COURT:  Good afternoon, sir.  If you'd try to

20   pull that seat closer to the microphone.  There you go.

21      You may proceed.

22                       DIRECT EXAMINATION

23   BY MR. ALERDING:

24   Q.   State your name, please.

25   A.   Michael Bryant.

BRYANT - Direct                                                          65

1    Q.   Michael, you are obviously in custody in the Kenton

2    County Jail; is that right?

3    A.   Yes, sir.

4    Q.   Were you in custody on October the 4th of 2017?

5    A.   No, sir.

6    Q.   That was the night that Mr. Jackson was arrested.  Did

7    you observe how that came about?

8    A.   Well, when I was pulling up to the house --

9    Q.   Now, what house?

10   A.   To my --

11   Q.   What address?

12   A.   228 East 13th.

13   Q.   So that's right at the area where Mr. Jackson was pulled

14   over?

15   A.   Yeah.

16   Q.   Okay.  And you were pulling up to a house?

17   A.   Um-hmm.

18   Q.   About what time of the morning was it?

19   A.   I don't know.  Probably it was like 12 something.  It was

20   at nighttime.

21   Q.   It was late in the evening?

22   A.   Um-hmm.

23   Q.   You didn't look at your watch?

24   A.   No.

25   Q.   What did you see happen?

BRYANT - Direct                                                    66

1        Did you know Mr. Jackson before then?

2   A.   Um-hmm.

3   Q.   You knew him?

4   A.   Yes.

5   Q.   Did you see him in a vehicle?

6   A.   Yes.

7   Q.   And what was he doing?

8   A.   It looked like he was sleeping.  I ain't for sure,

9   though, but he was laying back in his car.

10  Q.   Okay.  He was lying back in the seat of his car?

11  A.   Um-hmm.

12  Q.   Did you see a police officer go by?

13  A.   Yes.

14  Q.   What did you see that police officer do?

15  A.   I seen the police car ride up Garrard towards --

16  Q.   When you mean "up Garrard," do you know the difference

17  between north and south on Garrard, north being towards

18  Cincinnati?

19  A.   Yeah, going north.

20  Q.   Okay.  Which way was he going?

21  A.   The police car was going north.

22  Q.   Okay.  What did you see him do?

23  A.   Well, when I got out my car, before I walked -- before I

24  went in the house, I had walked to the corner, because my

25  house sit right there on the corner.  I went to the corner,

BRYANT – Direct                                                    67

1   and the police car was turning around.

2   Q.  Did it make a U-turn?

3   A.  Um-hmm.

4   Q.  Where did it go?

5   A.  It came back down, back down Garrard and rode through

6   Pleasant.

7   Q.  And what did it do there?

8   A.  It backed up.  Hit his reverse lights and backed up and

9   then followed Black down 13th.

10  Q.  Did you see this police car come down the street

11  backwards?

12  A.  Um-hmm.

13  Q.  And did you see Mr. Jackson apparently wake up or

14  whatever he was doing?  He looked like he was sleeping, right?

15  A.  Yeah.

16  Q.  His head was back?

17  A.  Yeah.

18  Q.  When he woke up, did you see him pull away?

19  A.  Yeah.  He woke up and made a right down 13th.

20  Q.  Okay.  And did the officer -- what did the officer next

21  do?

22  A.  The police car backed up, turned around, pulled him over.

23  Q.  Did he have to make another U-turn to get in behind

24  Mr. Jackson?

25  A.  Yes.

BRYANT - Direct                                                        68

1    Q.   Okay.  And that's all you saw?

2    A.   Yes.

3    Q.   After that point of observing this confrontation, you

4    didn't observe anything else?

5    A.   No.

6    Q.   You went in your apartment and mind your own business?

7    A.   Yes.

8    Q.   Okay.  Did you see any actual search of Mr. Jackson?

9    A.   No.

10   Q.   You stayed in?

11   A.   Yes.

12   Q.   Okay.  You had nothing to do with this, other than see

13   the initial confrontation?

14   A.   Yes.

15   Q.   So I want to get this straight.  How many U-turns did you

16   see this officer make before he finally came down the street

17   backwards and pulled this fella over?

18   A.   Two.

19   Q.   Two.  So he went once, turned around, went again, turned

20   around, then had to come back, backwards, and make -- and turn

21   around to follow him?

22   A.   Um-hmm.

23   Q.   Okay.  Did you see Mr. Jackson doing anything in his car

24   before the officer got in behind him, any movement at all?

25   A.   No.

BRYANT - Cross                                                          69

1        MR. ALERDING:  Thank you.  No other questions.

2        THE COURT:  Cross.

3                       CROSS-EXAMINATION

4    BY MR. BRACKE:

5    Q.   Mr. Bryant, why are you in custody?

6    A.   Trafficking.

7    Q.   Trafficking in what?

8    A.   Cocaine.

9    Q.   And who arrested you in that case?

10   A.   I believe Powers.

11   Q.   Was Officer Ullrich involved in your case at all?

12   A.   I ain't for sure.  I ain't for sure.  There was several

13   police there, but ...

14   Q.   And when was that arrest?

15   A.   November 13th, I think.

16   Q.   Of what year?

17   A.   2017.

18   Q.   Okay.  So you've been convicted of a felony; is that

19   right?

20   A.   Yes, sir.

21   Q.   Is that your only felony conviction?

22   A.   No, sir.

23   Q.   Okay.  What other felony convictions do you have?

24   A.   Gun spec.  I had a trafficking in 2006.

25   Q.   Okay.  And a gun spec.  What's a gun spec?

BRYANT - Cross                                                          70

1    A.   I guess it was somebody say you had a gun, but you don't

2    got no gun.  So got a gun spec.

3    Q.   Did you get convicted of it?

4    A.   Yeah.

5    Q.   Okay.  So that's three felony convictions?

6    A.   Yeah.

7    Q.   Any more?

8    A.   No.

9    Q.   Okay.  So when was the gun case?

10   A.   I think like 2012.

11   Q.   So three since -- starting in 2006, you had one felony in

12   '6, one felony in 2012, and one in 2017; is that right?

13   A.   2017?

14   Q.   Yes, sir, your newest case.

15   A.   Oh, yeah, yeah.

16            MR. BRACKE:  No further questions.

17            THE COURT:  Anything else?

18            MR. ALERDING:  Not of this witness, Your Honor.

19            THE COURT:  Thank you.  You may step down.

20        Next witness.

21            MR. ALERDING:  I would like to call Jarmaine Rice.

22            THE COURT:  All right.

23               JARMAINE RICE, DEFENSE WITNESS, SWORN

24            THE COURT:  Good afternoon, sir.

25   ///

*RICE - Direct*                                                            71

                              DIRECT EXAMINATION

2    BY MR. ALERDING:

3    Q.   Jarmaine, state your name, please.

4    A.   Jarmaine Rice.

5    Q.   And where is it that you live?

6    A.   I stay on 15th Street, East 15th.

7    Q.   Are you familiar with the area of 13th and Garrard?

8    A.   Yes, my aunts and uncles live down there.

9    Q.   Were you -- you weren't in custody October the 4th of

10   2017, were you?

11   A.   No, sir.

12   Q.   And did you see an arrest being made of this fellow that

13   you now know is Mr. Jackson?

14   A.   Yes, sir.

15   Q.   What did you see happen when the police all arrived?

16   A.   I know I was coming out of my Uncle Mike's house, Michael

17   Rice.  The address is 332 East 13th Street.

18        When I came out of the house, I seen a police down there

19   by the store, and they had him in handcuffs.  And I seen, I

20   seen one police tugging at his belt, and then they halfway

21   pulled down his clothes and started going in his groin area.

22   Q.   Did you see anybody unloosen his belt?

23   A.   I seen a police officer unloosen the belt.

24   Q.   Did you see a police officer lower his pants while he

25   conducted a search?

*RICE - Direct*                                                          72

1   A.   Yes, I did.

2   Q.   Okay.  Do you have an estimate of how far his pants came

3   down?

4   A.   I know --

5   Q.   If you could see from where you were?

6   A.   I was probably like about three houses up from the store.

7   I could like halfway see the back of his, like, drawers and

8   butt area, like.

9   Q.   Okay.  Did you see his undergarments?

10  A.   Yes, I did.

11  Q.   Did you see the officer reach into his undergarment?

12  A.   I seen him in there, and it was like, like he was down

13  there like you want to say he was probably like fondling -- I

14  thought he was fondling around with him.

15  Q.   He was reaching around in his private area in his

16  undergarments?

17  A.   Yes, he was.

18  Q.   You saw that?

19  A.   I saw that clearly.  I even got it on my phone.

20          THE COURT:  You took video on your phone?

21          THE WITNESS:  Yeah, I videotaped it when it was

22  happening.

23          THE COURT:  Do you have it?

24          THE WITNESS:  No, I don't have my phone.

25          THE COURT:  Does someone have it?

*RICE - Cross*                                                                73

 1           THE WITNESS:  I could probably try to get it.

 2           THE COURT:  If you can get it to Mr. Alerding, we'll

 3   supplement the record with it.  How about that?

 4           THE WITNESS:  I can try to do that.

 5           THE COURT:  Why don't you do that, Mr. Alerding.

 6   We'd love to see the video from three houses away.  I'm sure

 7   it shows exactly what he says it does.

 8           MR. ALERDING:  I will get it.

 9           THE COURT:  All right.

10           MR. ALERDING:  Thank you.

11           THE COURT:  I'll keep the record open for seven days

12   to enable you to get that.

13        You may proceed with cross-examination.

14                        CROSS-EXAMINATION

15   BY MR. BRACKE:

16   Q.  Mr. Rice?

17   A.  Yes, sir.

18   Q.  What are you in custody for now?

19   A.  I'm in custody for a traffic violation.

20   Q.  And have you ever been convicted of a felony offense?

21   A.  Yes, sir.

22   Q.  And how many times?

23   A.  Probably like two or three.

24   Q.  Okay.  And what was the most recent felony conviction?

25   A.  It was just recently for what I'm locked up for now.

*RICE - Cross*                                                                    74

1   Q.   What was that?

2   A.   U.S. Strike Force came to my house.

3   Q.   What was the crime you were convicted of committing?

4   A.   That's what I'm waiting to get indicted on now.

5   Q.   Oh, okay.  So you have a pending case?

6   A.   Yeah.

7   Q.   What's that for?  What are you charged with?

8   A.   That's what I'm waiting to get indicted on now.

9   Q.   I know.  What were you arrested for?

10  A.   They said trafficking.

11  Q.   Trafficking in what?

12  A.   Cocaine.

13  Q.   And what prior convictions do you have?

14  A.   I got a possession, and then I got another trafficking

15  like in '97.

16  Q.   All right.  And when was your possession conviction?

17  A.   It was -- I served out in 2012.  It was in 2007 or --

18  2009.

19  Q.   All right.

20  A.   I served out in 2012.

21  Q.   So you've got two prior felony convictions and a pending

22  felony case, right?

23  A.   Yes.

24  Q.   Do you know Officer Ullrich?

25  A.   I don't know him.

RICE - Cross                                                          75

1    Q.   Okay.  Were you involved in a fire of a car?

2    A.   No, that wasn't me.

3    Q.   Oh, okay.  You don't remember Officer Ullrich helping put

4    out the fire?

5    A.   No.

6    Q.   And where were you standing when you saw this search?

7    A.   I was like three or four houses up from the store.

8    Q.   Three or four houses in which direction?

9    A.   Well, it's like, it's like -- well, the store is at the

10   corner.  If you back, like saying we come back up the one-way,

11   it's a one-way coming up 13th Street.  If you're walking back

12   up, it's like three or four houses up.  It's 332 East 13th

13   Street, which is my uncle, Michael Rice's house.

14   Q.   So you were on 13th Street?

15   A.   Yeah.

16   Q.   Three or four houses away from where the police officers

17   were?

18   A.   Yes, sir.

19   Q.   And how many police officers were there?

20   A.   When he pulled up, there was one.  Another police car

21   pulled up behind him.

22   Q.   And so how many police cars were there altogether?

23   A.   I seen two.  From the time I seen, it was him and another

24   one.

25   Q.   You're not aware there was a third officer with a dog

RICE - Cross                                                              76

1    there?

2    A.   I didn't even stay out.

3    Q.   You didn't stay out?

4    A.   No, I didn't stay out there.  I walked back in the house.

5    Q.   Well, the officer with the dog was there before the

6    search happened, was there while the search happened.  You

7    didn't see him?

8    A.   Wasn't no dog there at first.

9    Q.   Did you ever see the dog?

10   A.   When he searched him, wasn't no dog really right there

11   searching the car or nothing.

12   Q.   There wasn't a dog in the area while this search

13   happened?

14   A.   Yeah, it was a dog in the area, but not searching him,

15   his person.

16   Q.   So you did see a police dog?

17   A.   Yeah, I seen a police dog.  I seen two cars.

18   Q.   Two police cars?

19   A.   Yeah.  When I was out there, I seen two police cars.

20   Q.   Well, how many police officers?

21   A.   I seen -- I seen one.  I seen Mr. Ullrich, and I seen

22   another one.

23   Q.   Okay.

24   A.   I seen Mr. Ullrich --

25   Q.   Where was the second officer?

*RICE – Cross*                                                                 77

1   A.   Who?

2   Q.   Where was the second officer?

3   A.   Both of the cars was parked right there on the street.

4   There was one like almost around the corner or something like

5   that, where the store at.

6   Q.   Where was the police dog?

7   A.   Where the who?

8   Q.   Where was the police dog?

9   A.   Police dog wasn't there when I was outside.

10  Q.   Okay.  So when this search happened, you're saying there

11  was no police dog there?

12  A.   I don't know if there was a police dog there or not.  All

13  I know, I seen them searching Mr. Black.

14  Q.   Searching who?

15  A.   Black.

16  Q.   Black?

17  A.   Mr. Black, right there.

18  Q.   Mr. Black.  What's his name?

19  A.   His name is -- his last name is Johnson.

20  Q.   Johnson?

21  A.   Yeah.

22  Q.   What's his first name?

23  A.   This first name, that's the name we call him on the

24  street is Black.

25  Q.   Black.  What's his first name?

*RICE - Cross*                                                                              78

1    A.   I don't know his first name.  I didn't hang with him on

2    the streets like that.

3    Q.   All right.  And so when you saw the defendant, the guy

4    here, this is the guy you saw, right?

5    A.   Yeah, that's the guy I saw right there.

6    Q.   When you saw him being searched, how many police officers

7    were there?

8    A.   There was two.

9    Q.   And no police dog?

10   A.   I said I didn't see a police dog.  I don't know if there

11   was a police dog present or not.

12   Q.   And how long did the -- you said the -- you said you saw

13   the pants come down, and the officer had his hand down in the

14   defendant's pants; is that right?

15   A.   Yes, he did.

16   Q.   How long did he have his hands down in the defendant's

17   pants?

18   A.   I don't know.  He was fondling with him.  I don't know.

19   You think I'm going to look at somebody being degraded like

20   that?

21   Q.   You watched it.  How long did this go?  How long did it

22   happen?  Five seconds, ten seconds?

23   A.   Probably like ten at the most.

24   Q.   Ten seconds?

25   A.   Five or ten seconds at the most, yeah.

1    Q.   And at the time this was happening, were the defendant's

2    pants up, or were they down?

3    A.   When he was going down his groin, his -- his belt buckle

4    area was right there by his buttocks.  You could see the back

5    of his butt.

6    Q.   And his underwear, was it still up?

7    A.   It was still up, but he still had his hands down his

8    pants.

9    Q.   Right, but his underwear was still up?

10   A.   It was half mast.

11   Q.   "Half mast" means what?

12   A.   You could see his buttocks.

13   Q.   How much of it?

14   A.   A little bit.  You can see.  I mean, it's clear, if you

15   can see his buttocks, you can see his buttocks.  It don't

16   matter.  If you can see his buttocks, you know how far it was

17   down.

18   Q.   Has anyone shown you the video of the search?

19   A.   Huh?

20   Q.   Have you seen the video of the search?

21   A.   Why would I want to see the video when I got my own

22   video?

23   Q.   I understand.  So if the Court watched the video of the

24   search and at no point in time in that search the pants were

25   pulled down, that's not consistent with what you saw?

*RICE - Cross*                                                                    80

1   A.   I mean, it's consistent with what I saw.  I know I seen

2   his hands down his pants.

3   Q.   And what day was this that this happened?

4   A.   I think it was October or something.  It was like the

5   4th, I think.

6   Q.   And what time was it again?

7   A.   Around 12:30, 1:00.

8   Q.   12:30 or 1:00.  And what did you do with the video that

9   you --

10  A.   I got it on my phone.

11  Q.   Right.  Who --

12  A.   I mean, I even posted it on Facebook.

13  Q.   Posted on Facebook in your account?

14  A.   Yeah, my account.

15  Q.   What's your name in your account?

16  A.   Why do I got to tell you that?  My name on my Facebook is

17  not my -- it's stay tuned in.

18  Q.   Well, we would like to find out to see --

19  A.   My name on my Facebook account is called stay tuned in.

20  Q.   Spell that out for us.

21  A.   S-t-a-y i-n t-u-n-e-d i-n.

22  Q.   Is this video there?

23  A.   If you go back.  I mean, you know, Facebook erase a lot

24  of stuff, but it should be on my news feed.

25            THE COURT:  If either side wants to make that part of

*ULLRICH - Recross*                                                        81

1    the record within seven days, they certainly can.  We have the

2    other video, but if he's got a different angle that shows HD

3    quality close-up, I can certainly look at it.

4    BY MR. BRACKE:

5    Q.   And you were two or three houses away on 13th Street when

6    this happened?

7    A.   Yeah, I was two or three houses up, up towards the

8    one-way.

9              MR. BRACKE:  Nothing further.

10             THE COURT:  Any redirect?

11             MR. ALERDING:  No, sir.

12             THE COURT:  You may step down.  Thank you, sir.

13             MR. ALERDING:  Judge, at this point, I'd like to

14   recall Officer Ullrich.

15      DOUGLAS ULLRICH, GOVERNMENT'S WITNESS, previously sworn

16                        RECROSS-EXAMINATION

17   BY MR. ALERDING:

18   Q.   Officer, I want to clarify a few things, because some

19   cases say things in a certain way, and I want to see if this

20   is what happened.

21        Did you unbuckle Mr. Jackson's belt?

22   A.   I did, sir.

23             THE COURT:  I saw that on the video.

24             MR. ALERDING:  Okay.

25             THE COURT:  All right.

ULLRICH - Recross                                           82

1    BY MR. ALERDING:

2    Q.   Did you unbutton or lower his shorts to permit a visual

3    inspection of his genital area?

4    A.   I unzipped his pants, and I pulled them straight out to

5    visually -- to be able to visually inspect before I stuck my

6    hand down his pants, make sure there's nothing that might hurt

7    me; needles, razor blades.  Once I saw that, I let his pants

8    fall back in, and I stuck my hand down in his underwear that

9    way.

10   Q.   Did you say, after you looked at his record, he asked you

11   why you were searching him, did you say, You've been known to

12   hide drugs in your underwear?

13        Do you remember saying that?  It was on the video.  Do

14   you remember saying it?

15   A.   I don't recall saying that.

16        THE COURT:  Do you know where on the video so we can

17   watch it?

18        MR. ALERDING:  It's on there.

19        THE COURT:  Why don't you pull up the particular time

20   so I can hear it if you want to reference it.

21        MR. ALERDING:  I don't think I made a reference to

22   that particular time, Judge.  I don't want to watch the whole

23   thing again.

24        THE COURT:  Why don't we pull up that time.  When,

25   right before or right after?

ULLRICH - Recross                                                    83

1          MR. ALERDING:  After he came back from getting his

2    record, right when he was doing the search.

3          THE COURT:  Let's pull that up.  I think I would have

4    written that down.

5          MR. BRACKE:  The disk is up there.

6          THE COURT:  That's fine.  Government's Exhibit 1?

7          MR. BRACKE:  Yes.

8          THE COURT:  You think it's right before or after the

9    search?

10         MR. ALERDING:  No, it's right during the search.  He

11   says, Why are you looking in my underwear?

12      He says, You've been known to have drugs in your

13   underpants.

14         THE COURT:  Let's see if it shows that.

15         MR. ALERDING:  I'm certain.  I've got some notes here

16   about the times.

17         MR. BRACKE:  Judge, my notes show the search

18   starts -- at 5:37:41, there's some talk about the search.  If

19   Mr. Alerding wants a different time, we can --

20         MR. ALERDING:  I think that's it.

21      (A portion of Government's Exhibit 1 was played.)

22         THE COURT:  Is it after this still, because I didn't

23   hear him say anything about that.

24         MR. ALERDING:  He didn't.  I'll watch the tape, and

25   I'll give the exact time.  I've seen it at the jail.  We

ULLRICH - Recross                                               84

1    reviewed it three times.  I didn't make note of the time.

2          THE COURT:  You can point it out in the brief that

3    you file.

4          MR. ALERDING:  In my brief, I will.

5          THE COURT:  Okay.

6    BY MR. ALERDING:

7    Q.  Does your department have any rules about conducting

8    searches of the genital area in the public -- in public view?

9    A.  There's a general order that covers strip searches.

10   Q.  Strip searches.  What do you consider to be -- what does

11   the department consider to be a strip search?

12   A.  I'd actually have to pull that order to give you what it

13   says.

14   Q.  Actually entering an orifice?

15   A.  Like I said, I'd have to review the policy to see.

16   Q.  Okay.  You don't consider this to be a strip search?

17   A.  No, not at all, sir.

18   Q.  But you do admit you unbuckled his belt, jostled his

19   clothing, and reached into his shorts?

20   A.  Absolutely.

21         MR. ALERDING:  Okay.  Thanks.

22         THE COURT:  Nothing else?  You may step down.

23         THE WITNESS:  Thank you, sir.

24         THE COURT:  Any further witnesses, Mr. Alerding?

25         MR. ALERDING:  Yes.  Judge, before I call this

ULLRICH - Recross                                                     85

1  witness, I want to see if you think it's relevant.

2     This witness has been strip searched and had his pants

3  pulled down in a convenience store by Officer Ullrich, and I

4  just wanted to show that he has a history of doing that

5  wherever -- in various occasions.  This fella did not observe

6  the search of Mr. Jackson.

7          THE COURT:  He will not be called, then.  That was

8  already covered in the prior order.

9          MR. ALERDING:  I just wanted to let you know that I

10  interviewed this fella, and he has that particular

11  information.

12          THE COURT:  Well, ultimately, this case will rise and

13  fall on what happened here.

14          MR. ALERDING:  Okay.

15          THE COURT:  If he did what he said he did here -- I

16  mean, that case, if it's an orifice search -- this is not an

17  orifice search.  This is, at the worst, I think a look-in.

18  There's some case law that talks about a look-in search.  I

19  think that's what this is, based upon what I've observed.

20     Is that Mr. Boles?

21          MR. ALERDING:  Yes.

22          THE COURT:  Okay.  I'm not going to permit Mr. Boles.

23  I thought he was going to be called as a witness to this

24  search.

25          MR. ALERDING:  No.  I had him subpoenaed because he

JACKSON - Direct                                                    86

1   told me about other things he's observed, and I will not call

2   him then.

3        THE COURT: Well, the Court's order speaks for

4   itself. The prior order that was entered, I think, sometime a

5   couple weeks back, as I recall.

6      Any further proof?

7        MR. ALERDING: Judge, my head is spinning. I've

8   looked at 300 cases on this stuff, and the defendant wants to

9   testify.

10        THE COURT: Okay. We're going to take a five-minute

11  recess.

12     (Recess from 2:58 p.m. until 3:06 p.m.)

13        THE COURT: Mr. Alerding, you may call your next

14  witness.

15        MR. ALERDING: Judge, I'd like to call Rodney

16  Jackson.

17        THE COURT: Very well.

18       RODNEY LAWRENCE JACKSON, DEFENDANT, SWORN

19        THE COURT: Mr. Alerding, you may proceed, sir.

20                    DIRECT EXAMINATION

21  BY MR. ALERDING:

22  Q.  Tell the judge your name.

23  A.  Rodney Lawrence Jackson.

24  Q.  Are you the subject of the arrest that occurred on 13th

25  and Garrard on October 14, 19 -- 2017?

*JACKSON - Direct*                                                    87

1    A.   Yes, sir.

2    Q.   Were you sitting in your car?

3    A.   Yes, sir.

4    Q.   What were you doing?

5    A.   I was -- I had just dozed off.

6    Q.   You were dozed off?

7    A.   Um-hmm.

8    Q.   Why were you there?

9    A.   I was waiting on my girlfriend.

10   Q.   Your girlfriend lives in that area?

11   A.   Her mother's name is Pansy.  She stays in the white house

12   right on the corner of 13th.

13   Q.   And you were waiting for her to get home?

14   A.   Um-hmm.

15   Q.   Where was she coming from?

16   A.   Work.

17   Q.   Where?

18   A.   Work.

19   Q.   Work?

20   A.   Um-hmm.

21   Q.   So did you see the officer drive by and give him some

22   kind of a stare?

23   A.   No.

24   Q.   What finally made you move your car?

25   A.   Michael Bryant and two other people were adjacent, across

JACKSON - Direct                                                    88

1    the street, on -- I guess that would be -- that's still 13th

2    Street, like the corner of 13th and Garrard by the red brick

3    house.  And he had said that there was police as he was going

4    inside of his yard.  I had looked through my driver's side

5    mirror, and he was going through the stop sign at Pleasant.

6    Q.   Was he making a U-turn?

7    A.   Yeah, he was already heading -- as he was going through,

8    I was looking through my driver's side mirror, he was on his

9    brake light going through the stop sign.  So when I seen him

10   doing that, I said, yeah, he's probably about to come back and

11   try to mess with me because you could see he was hitting the

12   brake light.  The brake light was going on and off.

13   Q.   Did he come down the street backwards?  Could you tell?

14   A.   Yeah, I couldn't tell if he was going down the street

15   backwards, but I could see from the direction that he was

16   going that he was going to come and turn around.

17   Q.   Okay.  You anticipated the police were going to mess with

18   you?

19   A.   Yes, sir.

20   Q.   So you pulled away?

21   A.   Yes, sir.

22   Q.   Knowing that, did you put on your signal?

23   A.   Yes, sir.

24   Q.   Do you know that rule?

25   A.   Yeah.  I just seen the police.

JACKSON - Direct                                                        89

1   Q.   Only about a tenth of the world knows that rule, but did

2   you put it on?

3   A.   Yes, sir.

4   Q.   Now, when you got to the corner, did you turn right?

5   A.   Yes, sir.

6   Q.   Head down that street?

7   A.   Yes, sir.

8   Q.   Did the officer come down the street with his lights on?

9   A.   Yes, sir.  He didn't have --

10  Q.   So he had his stuff on?

11  A.   Yeah.  He didn't have his siren on, but his lights was

12  on.

13  Q.   All right.  Well, he indicated -- we were talking about

14  the video cam, and he said he put his stuff on, but the video

15  cam didn't come on immediately.  Do you remember him saying

16  that?

17  A.   Yes, sir.

18  Q.   But you did see his lights coming?

19  A.   Yes, sir.

20  Q.   So did that indicate to you he was coming to pull you

21  over?

22  A.   Yes, sir.  It's why I pulled over on the side of the

23  road, because I'm doing the speed limit.  I think the speed

24  limit on that street might be 20 miles an hour or something

25  like that.  I'm doing the speed limit.  I see him come flying

*JACKSON - Direct*                                                    90

1    down the street behind me out of my rearview mirror so I

2    instantly got over on the right --

3    Q.   You knew you were going to get pulled over?

4    A.   Yeah.

5    Q.   Lights were on?

6    A.   Um-hmm.

7    Q.   He was coming?

8    A.   Yeah.

9    Q.   So then you stopped?

10   A.   Yes, sir.

11   Q.   All right.  When the officer approached your car, were

12   you able to find your driver's license?

13   A.   Yes, sir.

14   Q.   Were you able to find your registration and your

15   insurance?

16   A.   No, sir.

17   Q.   Okay.  You told him that?

18   A.   Yes, sir.

19   Q.   Did you ask him to give you a ticket --

20   A.   Yes, sir.

21   Q.   -- and move on with your life?

22   A.   Yes, sir.

23   Q.   So you saw the video.  The whole thing escalated into an

24   investigatory stop and a search, didn't it?

25   A.   Yes, sir.

*JACKSON - Direct*                                                  91

1   Q.   Did you give him permission to search you at any time?

2   A.   No, sir, I didn't give him permission to search me, nor

3   did I give him permission to search my vehicle with a K-9.

4   Q.   Did he unloosen your belt?

5   A.   Yes, sir.

6   Q.   Did he pull down your pants?

7   A.   Yes, sir.

8   Q.   Did he reach in to your underwear and grab your genitals?

9   A.   Yes, sir.  And if you clearly watch Officer Tipton's

10  tape, you can clearly see my genital area, which would clearly

11  show that my underwear had to be pulled down.  I had on

12  underwear.  I didn't have on boxers, so you couldn't just pull

13  them open.

14  Q.   I noticed on one of the videos when they started to lower

15  your pants, the camera came up when you --

16  A.   Um-hmm.

17  Q.   As the pants got lower, the camera got higher not to view

18  it.  Did you see that?

19  A.   Yes, sir, to take the visual off the actual area of where

20  he was searching.

21  Q.   All right.  But Officer Tipton's tape shows him reaching

22  into your pants and exposing your genitals, doesn't it?

23  A.   Yes.  If you clearly watch --

24  Q.   Did you see it?

25  A.   Yes.  If you clearly watch Officer Tipton's tape, you can

JACKSON - Direct                                                    92

1   see my actual pubic hair, which means if you can see my pubic

2   hair, that's my genitalia area.  So there's no way that my

3   pants was just opened, my underwear were just opened.  If you

4   can see my actual pubic hair, that means that's my genitalia.

5   Q.   Now, you told him a story about working for an FBI agent,

6   didn't you?

7   A.   Yes, sir.

8   Q.   You've done that before?

9   A.   Yes, sir.

10  Q.   But you weren't specifically authorized to do it this

11  time, were you?

12  A.   No, sir.

13  Q.   But you told him that anyhow?

14  A.   Yes, sir.

15  Q.   Why do you talk to much at the scene there?

16  A.   I should have probably never said anything to him, but I

17  had informed him because I was told by the officer if I did

18  come in contact, you know, with law enforcement, the same way

19  if you're on probation, you let them know that you're on

20  probation.

21  Q.   And you did that?

22  A.   Yes, sir.

23          THE COURT:  He told them he was on probation?

24          MR. ALERDING:  I don't think he did.

25  ///

JACKSON - Cross                                                     93

1    BY MR. ALERDING:

2    Q.   Did you tell them that?

3    A.   No, I didn't tell him I was on probation, but I had told

4    him as far as my dealings with --

5    Q.   The other stuff?

6    A.   Yes, sir.

7    Q.   When he came back and told you about -- maybe I'm losing

8    my mind, but did you hear him say you've been known to what?

9    A.   Have stuff on you in the past.  I'm not sure if that's

10   actually the flash drive that we have.  That might be a

11   different one than we have.  But the flash drive that we

12   actually have, that me and you actually watched with your son,

13   you actually hear him say, You've been known to have stuff on

14   you in the past.  That's what he said verbatim.

15   Q.   We watched it at the jail?

16   A.   Yes, sir.

17   Q.   You, me, and my son?

18   A.   Yes, sir.

19   Q.   All the tapes?

20   A.   Yes, sir.

21           MR. ALERDING:  Thank you.  No other questions.

22           THE COURT:  Mr. Bracke.

23                      CROSS-EXAMINATION

24   BY MR. BRACKE:

25   Q.   You've been convicted of felony offenses three prior

*JACKSON - Cross*                                                                94

1     times; is that right?

2     A.   No.   Two.

3     Q.   Okay.  You were convicted of a federal firearms offense,

4     correct?

5     A.   Yes, sir.

6     Q.   Were you convicted of something in 2007?

7     A.   Yes.

8     Q.   Drug trafficking offense?

9     A.   Yes, sir.

10    Q.   Were you convicted of another offense in 2005?

11    A.   Yeah, yeah.

12    Q.   That's the three?

13    A.   Um-hmm.

14    Q.   All right.  Now, make sure I understand something.  You

15    told the police that night that you had bought -- I'm sorry.

16         You didn't tell the police that you were on probation,

17    correct?

18    A.   No, sir.

19    Q.   Okay.  You told them that you were working for Peter

20    Lakes of the DEA; is that right?

21    A.   Yes, sir.

22    Q.   Do you know that Peter Lakes works for the FBI?

23    A.   Yes, sir.

24    Q.   Okay.  Then why did you tell them DEA instead of the FBI?

25    A.   Actually, it was the DEA because that was the actual

JACKSON - Cross                                                      95

1    department that I was dealing with him around.

2    Q.   Who were you dealing with from DEA?

3    A.   It was Peter -- okay, listen.  He might have actually

4    been employed by the FBI, but as I told my probation officer,

5    Tom Barbeau, I was dealing with him about a DEA matter.

6    Q.   Okay.

7    A.   So I might have, I guess, the semantics of the acronyms

8    wrong, but that was the actual department that, you know, was

9    entailed.

10   Q.   That night, were you acting at the request of any police

11   officer?

12   A.   No, sir.

13   Q.   So when you bought those drugs, you weren't doing that

14   for the police?

15   A.   I didn't buy no drugs.

16   Q.   The drugs that you had on you, you weren't holding them

17   for police, were you?

18   A.   Yes.

19   Q.   Okay.  Were any police -- did police know that you had

20   drugs?

21   A.   They knew --

22   Q.   Did you tell them you were going to buy drugs?

23   A.   Yes.

24   Q.   Who did you tell you were going to buy drugs?

25   A.   Are you talking about at that specific time?

JACKSON - Cross                                              96

1   Q.   Yes.

2   A.   Nobody at that specific time.

3   Q.   So you didn't tell anybody, I'm going out on October 4th

4   and getting drugs?

5   A.   No.

6   Q.   Okay.  When did you get those drugs?

7   A.   I don't know what you're talking about.  Allegedly, I

8   possessed those drugs.

9   Q.   The methamphetamine that was in your pants.

10  A.   Allegedly.

11  Q.   Okay.  Was there any methamphetamine in your pants?

12          THE COURT:  Hold on.  Hold on.  We saw that it was.

13  Whether or not it's legal for them to do the search is what

14  I'm here to decide, but there was something, which I'm

15  presuming we would have a lab tech to say that it was meth.

16          MR. BRACKE:  I just want to ask about his

17  credibility, because obviously it seems to me like his

18  observations of that night are questionable.

19          THE COURT:  Okay.  That's fine.

20  BY MR. BRACKE:

21  Q.   Did you have anything in your pants?

22  A.   Yes.

23  Q.   Okay.  Was it a latex glove?

24  A.   Yes.

25  Q.   Did that latex glove contain two bags of methamphetamine?

*JACKSON - Cross*                                                    97

1    A.   That I don't know.

2    Q.   Okay.   How -- the substance that was in the bags, what

3    did you think it was?

4    A.   I don't know.

5    Q.   How long had you had it?

6    A.   I don't know.

7    Q.   When did you get it?

8    A.   I don't know.

9    Q.   Did you get it a week before, a month before, a year

10   before, ten minutes before?   How long had you had that

11   substance?

12   A.   I don't know, sir, because if you clearly see on the

13   tape, you can't see exactly where he took those from, but you

14   see he pulled my pants down to confiscate that glove.

15        MR. BRACKE:   Judge, ask to strike the answer as

16   nonresponsive.

17        THE COURT:   So stricken.

18        MR. BRACKE:   Thank you.

19   BY MR. BRACKE:

20   Q.   How long did you have that substance that was in your

21   pants?

22   A.   I don't know.

23   Q.   You don't know if it was minutes, hours, or days?

24   A.   I don't know.

25   Q.   And you don't know where you got it from?

JACKSON - Cross                                            98

1   A.   I have to speak with my lawyer before I can answer that

2   question.

3   Q.   I'm sorry.  You're on the stand.  You have to answer the

4   questions put to you.

5           THE COURT:  Sir, you just have to answer the

6   questions.

7           THE WITNESS:  Okay.  I mean, I guess if -- that was

8   the 4th?  That day, earlier that day.

9   BY MR. BRACKE:

10  Q.   So now you remember how long you had it.  When did you

11  get it earlier that day?

12  A.   I'm assuming that it was around, around that time.

13  Q.   Around what time?

14  A.   Earlier in the day.

15  Q.   What day?

16  A.   It was 1:24 on October the 4th when I was pulled over.

17  Q.   Right.

18  A.   So I'm assuming maybe it was on October the 3rd.

19  Q.   About when?

20  A.   I don't know.

21  Q.   Daytime, nighttime, morning?

22  A.   Daytime.

23  Q.   Daytime.  So before dinner, after dinner?

24  A.   I don't know.

25  Q.   And who did you get them from?

JACKSON - Cross                                                      99

1   A.   Allegedly, from the person that I was supposed to be

2   getting the actual narcotics from.

3   Q.   And what person did you get them from?  What's that

4   person's name?

5   A.   I don't know.

6   Q.   And what street name do you know that person by?

7   A.   I don't know.

8   Q.   What phone number do you have for that person?

9   A.   I don't know.

10  Q.   How did you contact that person?

11  A.   I don't know.

12  Q.   So how did you reach out to that person to get these

13  drugs?

14  A.   I'm not sure.

15  Q.   And all of this information about this person whose name

16  you don't know and contact information you don't know, did you

17  pass any of that information on to the police before buying

18  these drugs?

19  A.   Yes.

20  Q.   Okay.  So what did you tell them?

21  A.   Well, actually, it was the plan that I was supposed to be

22  purchasing a large amount from this person.

23  Q.   From who?

24  A.   From this alleged person.

25  Q.   What person?

 1   A.   I don't know what his name is.

 2   Q.   Okay.  So you called the Peter Lakes and said, "There's

 3   some guy I want to buy a large amount of drugs from" and

 4   didn't give him a name?

 5   A.   They know his name.

 6   Q.   Okay.  Well, what was the name?

 7   A.   I don't know.

 8   Q.   All right.  And when you were stopped -- how much did you

 9   pay for the drugs?

10   A.   I don't know.

11   Q.   Okay.  Well, you told the police that night it was

12   methamphetamine.  Do you remember saying that?

13   A.   No, I don't remember saying any of that, because I

14   definitely wasn't read my Miranda rights.  If you play back

15   Officer Ullrich's tape, he never read me my Miranda rights so

16   anything was said after allegedly I was arrested wouldn't be

17   admissible anyway because I was never read my Miranda rights.

18   Q.   Were you awake during the hearing today?

19   A.   During my hearing?  When did you ever play him reading me

20   my Miranda rights?

21   Q.   Well, I played it once during Officer Ullrich's

22   testimony, and I played it again during Officer Tipton's

23   testimony.

24   A.   Read my Miranda rights?

25   Q.   Did you not hear it twice?

1    A.   No.  Your Miranda rights is you have the right to remain

2    silent.  Anything you say will be used against you in a court

3    of law.  He never said that.

4    Q.   Okay.  That's your testimony?  You remember that very

5    distinctly?

6    A.   I mean, if you would like to play the tape back --

7    Q.   Do you remember that distinctly, or are you guessing?

8    A.   I'm telling you distinctively.

9    Q.   All right.  So you're as sure about that as you are about

10   any other part of your testimony?

11   A.   If you'd like to play back the tape --

12   Q.   No, sir.  The question is, are you sure of it?

13   A.   Yeah, very clearly.

14   Q.   All right.  And you were waiting to meet your girlfriend,

15   right?

16   A.   Yes.

17   Q.   Not the police?

18   A.   I never said nothing about waiting --

19   Q.   When were you planning on telling the police about the

20   substance you had bought earlier on October 3rd?

21   A.   I was supposed to get with my handler that day.

22   Q.   Who was your handler?

23   A.   Pete Lakes.

24   Q.   And who made the arrangement for you to get with Peter

25   Lakes on October the 4th?

*JACKSON - Cross*                                                    102

1    A.   Me and him discussed this.

2    Q.   When did you tell Peter Lakes about this?

3    A.   We had already previously discussed it.

4    Q.   When?

5    A.   I want to say maybe October the 1st or the -- October 1st

6    or 2nd.

7    Q.   So on October 1, you made arrangements with Peter Lakes

8    to buy drugs at some point in time and then meet him on

9    October 4th; is that right?

10   A.   Actually, we was meeting on October 4th because he was

11   going to be giving me money.

12   Q.   But on October 1, you set up this meeting that was going

13   to happen on October 4th, correct?

14   A.   Yes.

15   Q.   And you did that by calling him?

16   A.   No.  We actually met at the field office in Kenwood.

17   Q.   On October 1?

18   A.   Um-hmm.

19   Q.   You had marijuana in your car, correct?

20   A.   No.

21   Q.   Okay.  The officers didn't find any marijuana in your

22   car?

23   A.   No, and you'll never play the tape where it shows

24   marijuana neither.

25   Q.   The question was, did you have marijuana in your car?

JACKSON - Cross                                              103

1    A.   No, there was no marijuana in my vehicle, and they never

2    also showed any marijuana in my vehicle.

3    Q.   I'm just asking if you're sure about that.

4    A.   If you play the tape, it will recollect itself.

5    Q.   That's not the answer to the question.  Are you sure

6    about that, sir?

7    A.   It's very ironic how you're asking questions if you know

8    the answers to them, but you're not showing your just cause of

9    how you know the answer.

10           THE COURT:  Sir, he'll ask questions.  You can

11   answer.  Whether something's ironic or not doesn't really

12   matter.  I'm here to decide whether or not the search was

13   appropriate or not appropriate.

14      You're saying you used your turn signal both times.  He

15   said you didn't.  Now, if I believe you, 100 percent, you win.

16   No reasonable suspicion to pull you over.  Done.  So

17   everything you're saying here is relevant to determine the

18   credibility of the witnesses.

19      You say you weren't Mirandized.  I just watched a tape

20   that said you were.  So I'm kind of stuck in the middle here.

21   You're asking me to believe you, but then you say something

22   which is contradicted by the tape.  Makes it more difficult

23   for the Court.

24      Go ahead, Mr. Bracke.

25           MR. BRACKE:  No further questions.

1          THE COURT:  Any redirect?

2          MR. ALERDING:  No, sir.

3          THE COURT:  You may step down.

4      Any further proof, Mr. Alerding?

5          MR. ALERDING:  There is none, Judge.

6          MR. BRACKE:  No rebuttal, Your Honor.

7          THE COURT:  Very well.

8          MR. ALERDING:  Judge, I'm --

9          THE COURT:  Before I forget, we'll keep the record

10    open for seven days in the event that you want to provide the

11    Court with this video that Mr. Jarmaine Rice said he took on

12    his phone that he posted on his Facebook account.  If you want

13    to find that, maybe elicit the assistance of your son, who

14    might have access to Facebook, when I'm sure you do not, just

15    based upon your experience level.

16          MR. ALERDING:  I don't trust Zuckerberg.

17          THE COURT:  At any rate, I'll keep the record open

18    for seven days.

19          MR. ALERDING:  Judge, I'm leaving town tomorrow to go

20    to Arizona, but I'll get my son -- I'll get ahold of somebody

21    who can bring the phone to my son, and we'll get the phone or

22    the Facebook, and we'll figure out --

23          THE COURT:  In whatever form you want to put it in.

24    I still -- I'm sure a video taken from a police officer's body

25    cam from close range is probably much more helpful than a

1  camera phone from three to four houses away anyway, but I do

2  want to give him an opportunity to present whatever evidence

3  he says he's able to present, and I'll give you -- I can give

4  you ten days to do that.

5        MR. ALERDING:  Would you please do that, because I'll

6  be back on Sunday night, a week from Sunday.

7        THE COURT:  Okay.  What's today?  Today is the --

8        MR. ALERDING:  Today is the 3rd.

9        THE COURT:  I'll give you until the 17th.

10        MR. ALERDING:  Perfect.  I'll have everything here.

11        THE COURT:  You wanted to submit a post-hearing

12  brief, correct?

13        MR. ALERDING:  I want to submit a brief.

14        THE COURT:  Here's what we'll do.  You'll need to

15  make arrangements with the court reporter to get the

16  transcript.  Have your son complete whatever he needs to

17  complete or view, of course, to get that transcript.

18     Once the transcript is filed, how much time do you want

19  to file your written brief?

20        MR. ALERDING:  Judge, I've done a lot of research.

21  It would take me about two weeks.

22        THE COURT:  All right.  Once the transcript is filed,

23  I'll give you 14 days to file a written supplemental

24  memorandum.  Mr. Bracke will have 14 days to respond, and the

25  case will be submitted for decision.  Is that fair?

1        MR. ALERDING:  After the decision, if there's a case

2    to be held, you'll set a trial date then?

3        THE COURT:  Yes, probably.  Depending on what the

4    result of the suppression motion was, I'll likely have some

5    sort of status call soon thereafter.

6        MR. ALERDING:  We just want to know where we stand.

7    Thanks.

8        MR. BRACKE:  Judge, just for the record, I have some

9    questions about how we know that the document that's being

10   tendered to the Court after the hearing is authentic.

11     I think that's something that we might -- I might have

12   questions about as to where did it come from, who would

13   testify as to its authenticity as to those things.

14     If it's something that Mr. Alerding -- when it's filed,

15   could we have an affidavit filed with it establishing the

16   circumstances under which it was obtained so that we can, if

17   necessary -- I might want to revisit that particular topic

18   just because anybody can submit anything --

19     (Indiscernible crosstalk.)

20        THE COURT:  -- know how helpful it's going to be to

21   begin with.

22        MR. BRACKE:  I agree.  It may not be necessary.  It

23   may not even be found.  If it's found, I'd like something

24   filed with it that establishes the circumstances under which

25   it was found.

1        Once I see that document, I see the video, I see whatever

2    it is that establishes its authenticity, I'd like five days to

3    file any request for -- to make any motions relating to the

4    authenticity of that item.

5            THE COURT:  You can have your five days.  If you can

6    submit something --

7            MR. ALERDING:  I will.  Pretty obvious the video is

8    supposed to be of a search of Mr. Jackson.  If it looks like a

9    search of Mr. Jackson, it would be hard to have a different

10   search of Mr. Jackson on video.

11           THE COURT:  I don't even know where he was,

12   specifically.  Three or four houses down.  That's probably,

13   given the row-type houses on that street, 60, 70 feet.

14           MR. ALERDING:  Yeah.

15           THE COURT:  If I'm taking a video, unless I make it

16   bigger, it's hard to see from that distance.

17           MR. ALERDING:  I'll see if I can find it.  If it's

18   worthwhile entering, I'll enter it.  If it's not, we'll forget

19   about it.

20           THE COURT:  Once it's filed or submitted -- file a

21   notice.  File a notice with the Court and actually submit the

22   original to the Court.  That's how I think it would need to be

23   submitted.

24           MR. BRACKE:  I would think so.  And I'd like a copy

25   as well.

1        MR. ALERDING:  I will.

2        MR. BRACKE:  We'll get a copy.  It may be if one of

3    the members of the Alerding family downloads this from

4    Facebook and says so in an affidavit or a filing, that may be

5    enough to satisfy me.  I just need to see the circumstances

6    and I want to leave open the idea of challenging --

7        THE COURT:  I'll give you five days after the notice

8    is filed to challenge it.

9        MR. BRACKE:  Thank you, Judge.

10        MR. ALERDING:  I think Tony took down the Facebook --

11        THE COURT:  I did.  I don't have Facebook, but I know

12    people that do, and I'm sure they'll check.

13        MR. ALERDING:  I'll get it from Tony, and I'll find

14    it.

15        THE COURT:  Very well.

16     Mr. Jackson, you understand what we're doing next?

17        THE DEFENDANT:  Um-hmm.

18        THE COURT:  There's going to be -- the transcript of

19    the hearing is going to be made available to the lawyers.

20     Once that's filed, your lawyer will have two weeks to

21    file a written brief, the United States will have two weeks to

22    file a response brief, and then the case will be submitted,

23    finally submitted to me to decide.  Then I'll have 30 days to

24    enter an order.

25        MR. ALERDING:  Thank you.

109

1          THE COURT:  Very well.  Defendant will be remanded to

2     custody of the marshal.

3         We'll be in recess.

4         (Proceedings concluded at 3:29 p.m.)

5                          - - -

6

7                    C E R T I F I C A T E

8          I, LISA REED WIESMAN RDR-CRR, certify that the
      foregoing is a correct transcript from the record of
9     proceedings in the above-entitled case.

10

11    _\s\ Lisa Reed Wiesman_              May 30, 2018
      LISA REED WIESMAN, RDR-CRR          Date of Certification
12    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                        INDEX

2        **GOVERNMENT'S WITNESSES**

3        DOUGLAS ULLRICH
         Direct Examination............................... Page 8
4        Cross-Examination................................ Page 32
         Redirect Examination............................. Page 47
5
         TYLER TIPTON
6        Direct Examination............................... Page 49
         Cross-Examination................................ Page 53
7        Redirect Examination............................. Page 53

8        MIKE LUSARDI
         Direct Examination............................... Page 55
9        Cross-Examination................................ Page 61

10       DOUGLAS ULLRICH
         Recross-Examination.............................. Page 81
11

12       **DEFENSE WITNESSES**

13       MICHAEL BRYANT
         Direct Examination............................... Page 64
14       Cross-Examination................................ Page 69

15       JARMAINE RICE
         Direct Examination............................... Page 71
16       Cross-Examination................................ Page 73

17       RODNEY LAWRENCE JACKSON
         Direct Examination............................... Page 86
18       Cross-Examination................................ Page 93

19                                       - - -

20       **GOVERNMENT'S EXHIBITS**

21       Exhibit           Description          Identified  Admitted
         1         Officer Douglas Ullrich's body        28        28
22                 cam video

23       5         10/4/17 KYIBRS report                 46        46

24       4         Officer Douglas Ullrich's             48        48
                   curriculum vitae
25

111

**GOVERNMENT'S EXHIBITS** (continued)

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| 3 | Officer Tyler Tipton's body cam video | 54 | 54 |
| 2 | Officer Mike Lusardi's body cam video | 56 | 56 |

**DEFENSE EXHIBITS**

| Exhibit | Description | Identified | Admitted |
|---|---|---|---|
| 1 | 10/4/17 traffic citation | 34 | 35 |

- - -