UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CRIMINAL ACTION NO. 17-50-DLB-CJS

UNITED STATES OF AMERICA                              PLAINTIFF

vs.                  **MEMORANDUM OPINION AND ORDER**

RODNEY LAWRENCE JACKSON                        DEFENDANT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

This matter is currently before the Court upon Defendant Rodney Lawrence Jackson's Motion to Suppress evidence seized from his person during a traffic stop on October 4, 2017. (Doc. # 15). The Court conducted an evidentiary hearing on May 3, 2018. (Doc. # 44). Defendant was present for the hearing and was represented by Attorney F. Dennis Alerding. The Government was represented by Assistant United States Attorney Anthony Bracke. At the conclusion of the hearing, the Court allowed Defendant additional time to supplement the record with the personnel file of the officer who conducted the search at issue (Doc. # 58), and to submit supplemental memoranda.[1] (Doc. # 44). Following supplemental briefing, the Court took the Motion under submission. The Motion is now fully briefed (Docs. # 15, 18, 47, 50, 54, 55, and 59), and

---

[1] In addition to the supplemental material filed by the Defendant's attorney, *see* (Docs. # 54-1 and 59), the Defendant has also submitted a set of handwritten letters for the Court to consider. Identical copies of the same letter, dated August 28, 2018, were addressed to the undersigned and to the Clerk of Courts. The Court has reviewed Defendant's handwritten arguments and concludes that the bulk are duplicative of those already raised and adjudicated in prior proceedings. *See* Doc. # 52 and 58). The remaining arguments raised by Defendant— particularly the credibility of the arresting officer—will be addressed and taken up herein in tandem with defense counsel's arguments.

is ripe for the Court's review.  For the reasons set forth herein, Defendant's Motion to Suppress is **denied**.

I.     ISSUES RAISED

On December 14, 2017, a federal grand jury returned an Indictment, charging the Defendant with possession of a mixture or substance containing methamphetamine, with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).  (Doc. # 1).  A Superseding Indictment was returned against the Defendant on March 22, 2018.[2]  (Doc. # 20).  The Defendant then filed a Motion to Suppress on February 22, 2018, seeking suppression of the evidence—namely, twenty-six grams of methamphetamine—seized during his arrest on October 4, 2017, and located in his underwear during the officer's search of his person. In his Motion, Defendant states that he was stopped for a routine traffic stop, a drug dog was brought in for no reason, and a strip search was conducted in public in front of a large group of people, all in violation of the U.S. Constitution.  (Doc. # 15).  Specifically, he claims that (1) the initial stop was improper, because Defendant did not commit a traffic offense and the stop was motivated by racial animus; (2) the officers lacked probable cause to initiate the search of Defendant's person; and (3) the search of Defendant's person exceeded the scope of permissible searches under the Fourth Amendment, because in the course of searching Defendant's underwear at the scene of the traffic stop, the officers violated the rules regarding strip searches.  (Doc. # 47).

In response, the Government argues that the evidence was seized in accordance with the Fourth Amendment because the officer's investigation of a lawful traffic stop

---

[2]     The Superseding Indictment clarifies the quantity and purity of methamphetamine involved in the offense, 5 grams or more of actual methamphetamine.  (Doc. # 20).

reasonably gave rise to further investigation of drug-related activity based upon Defendant's behavior and his claim that he was working as an informant to buy drugs. (Doc. # 18). Based upon the suggestion of drug activity, a reasonable canine sniff of the vehicle was conducted. *Id.* (citing *United States v. Garcia*, 496 F.3d 495, 504 (6th Cir. 2007)). The Government concludes that, based upon the detection of a controlled substance in the vehicle by the dog sniff, the officers then were permitted to conduct the search of his person. *Id.* The Government further contends that the basis of the search of Defendant's person is bolstered by the inevitable discovery doctrine, as, after the dog alerted to the presence of controlled substances, the police searched the Defendant's vehicle and found marijuana. *Id.* (citing *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1994)).

## II. FINDINGS OF FACT

During the evidentiary hearing held on May 3, 2018, the Court heard testimony from six witnesses. The Government called Officers Douglas Ullrich, Tyler Tipton, and Taylor Lusardi. Defendant called Michael Bryant and Jarmaine Rice, and Defendant also testified on his own behalf. Following the hearing, Defendant supplemented the record with the personnel file of Officer Ullrich who conducted the search at issue. Weighing the credibility of the witnesses, and considering the exhibits admitted during the hearing as well as the supplemental material submitted by Defendant after the hearing, the Court makes the following factual findings:

On October 4, 2017, at approximately 1:24 a.m., Officer Douglas Ullrich, a Police Specialist with the Covington Police Department, observed Defendant parked in an SUV in a high-crime area. Ullrich observed a look of alarm when Defendant spotted the

marked police cruiser; Defendant pulled off the curb and turned right onto 13th Street without signaling. (Doc. # 46 at 11). Ullrich turned his vehicle around to follow Defendant. After catching up and following Defendant's vehicle a short distance, Ullrich observed Defendant pull into a parking lane at the corner of 13th Street and Wheeler, again without signaling. *Id.* at 13. Officer Ullrich activated his emergency lights and conducted the stop. *Id.* at 15. At that time, Ullrich learned from dispatch that Defendant's license plate was expired. *Id.* at 15-16.

Officer Ullrich approached Defendant's vehicle on foot and identified himself as a Covington Police Officer; Ullrich also informed Defendant that the reason for the stop was Defendant's failure to use a signal when he turned onto 13th Street. (Govt. Ex. 1 at 05:24:31). Defendant responded, "I apologize." *Id.* at 05:24:41. Ullrich requested Defendant's registration and proof of insurance in addition to the license Defendant had provided. (Doc. # 46 at 17). Defendant began paging through paperwork, but was unable to produce either the vehicle registration or proof of insurance. *Id.* See also Govt. Ex. 1 at 05:27:18). Defendant stated that he was in the area because he was driving for Uber. (Govt. Ex. 1 at 05:24:49-05:25:07). Unprompted, Defendant also assured the officer that he should not worry because there were no "illicit drugs" in the vehicle. *Id.* at 05:25:44. Defendant also mentioned that he worked for "the Feds" and the DEA, but that it was classified and that he was not "at liberty" to talk about it; Defendant was unable to provide contact information for the federal agent with whom he claimed to be working. (Doc. # 46 at 17-18). See also Govt. Ex. 1 at 05:25:45-05:27-02).

Once Ullrich confirmed that Defendant was unable to produce the insurance or registration, he returned to his patrol car to run Defendant's information. (Doc. # 46 at

20; Govt. Ex. 1 at 05:27:18-05:29:32). Ullrich checked Defendant's prior history through Kentucky CourtNet and found that Defendant had multiple arrests and convictions for drug trafficking in Kenton County; furthermore, Ullrich determined that Defendant was also on federal supervision at that time. (Doc. # 46 at 20-21). Based upon Defendant's statements related to drug activity and the other suspicious circumstances, Ullrich called for a K-9 unit to conduct a brief sweep of Defendant's vehicle.

Officer Michael Lusardi arrived at the scene within approximately nine minutes after the stop was initiated. *Id.* at 20. Lusardi was accompanied by a dog specially trained to detect controlled substances, including methamphetamine. *Id.* at 57. Officer Lusardi asked Defendant to step out of the vehicle, explaining that the sweep could not be performed safely with Defendant inside. (Govt. Ex. 2 at 05:34:38). Defendant complied with Officer Lusardi's request and stepped out of the vehicle. Officer Lusardi conducted a frisk of Defendant's person, and Defendant was directed to sit on the curb a short distance away. Officer Lusardi then retrieved the dog and conducted a brief sweep of the vehicle. (Govt. Ex. 2 at 05:35:57-05:36:36). The sweep lasted approximately twenty seconds. *Id.* at 05:36:16-05:36:36. The dog indicated on the driver's door. (Doc. # 46 at 58). Officer Lusardi informed Ullrich that the dog had indicated on the presence of narcotics in or about the vehicle. *Id.* at 22.

Upon the positive indication by the dog, Ullrich then conducted a search of Defendant's person for controlled substances while Lusardi conducted a search of the vehicle. *Id.* at 24, 36, 47. Ullrich asked the Defendant to stand and spread his feet apart in order to conduct the search. *Id.* at 24. *See also* (Govt. Ex. 1 at 05:37:51-05:39:32). Despite multiple requests to spread his feet wider, Defendant only spread his feet

shoulder-width apart. *Id.* Ullrich believed that Defendant's failure to spread his legs was indicative of possession of contraband or an intent to flee or fight; accordingly, Ullrich detained Defendant in handcuffs at that point and continued his search. (Govt. Ex. 3 at 05:37:30). Ullrich asked Defendant again to spread his feet apart, but Defendant indicated that was as far as his feet went. (Doc. # 46 at 24; Govt. Ex. 1 at 05:39:32). Ullrich searched up through Defendant's groin area on the outside of Defendant's pants and located a large bulge that was clearly not part of Defendant's person. (Doc. # 46 at 24). Ullrich unfastened Defendant's belt and unzipped the zipper on his pants. *Id.* at 25, 52. Defendant's pants were lowered.[3] (Govt. Ex. 1 at 05:39:59). Ullrich used his right hand to pull Defendant's pants straight out from his body, look in Defendant's pants, and then stuck his hand into Defendant's groin area, retrieving the item within approximately five seconds. (Doc. # 46 at 25, 78, 82; Govt. Ex. 1 at 05:39:20-05:39:54; Govt. Ex. 3 at 05:39:40). During Ullrich's retrieval of the item, Defendant's buttocks was exposed for a few seconds, but mostly covered by his long shirt. (Doc. # 46 at 71-72, 79; Govt. Ex. 1 at 05:39:59). Pubic hair was also briefly visible, but his genitals were not exposed to view. (Doc. # 46 at 25, 52, 71-72, 91-92; Govt. Ex. 3 at 05:39:40-05:41:00). There were approximately four people watching fifty or sixty feet away at the time the search of Defendant's person was conducted. (Doc. # 46 at 24, 51). *See also generally* (Govt. Ex. 3). Additionally, two individuals looked out of their windows onto the scene. (Doc. # 46 at 44).

---

3      Prior to the search of his person, as he exited the vehicle and sat on the curb, Defendant can be seen wearing a long white shirt, with pants belted several inches below his hips such that a large swathe of blue underwear and a portion of his buttocks were already visible between his shirt and pants. (Govt. Ex. 2 at 05:35:02; Govt. Ex. 3 at 05:37:27-05:37:39).

After retrieving the item, Ullrich pulled Defendant's pants up and finished searching Defendant's person. (Govt. Ex. 1 at 05:40:08). Ullrich informed Defendant that he was under arrest at that time, and further informed Defendant of his *Miranda* rights. (Doc. # 46 at 26-27; Govt. Ex. 1 at 05:40:40; Govt. Ex. 3 at 05:40:40). After the search arrest, Ullrich walked Defendant approximately ten feet to the police cruiser, and secured Defendant inside. (Doc. # 46 at 26).

The item retrieved from Defendant's person was a latex glove containing two bags of methamphetamine. *Id.* at 52. Additionally, in Officer Lusardi's contemporaneous search of the vehicle, he located loose marijuana on the driver's side floor. (Doc. # 46 at 27, 36, 60; Govt. Ex. 2 at 05:43:19-05:46:59). The officers also recovered the lid to a digital scale from underneath the driver's seat. (Doc. # 46 at 27).

### III. ANALYSIS

#### A. The initial stop did not violate Defendant's Fourth Amendment rights.

Officer Ullrich had a lawful basis to conduct the initial traffic stop. Defendant argues that the stop violated his Fourth Amendment right to be free from an unreasonable search and seizure. (Doc. # 47). The Government responds that the officers stopped Defendant for a valid traffic violation because the officers had probable cause to believe that Defendant violated Ky. Rev. Stat. § 189.380. (Doc. # 18). This statute states that "[a] person shall not turn a vehicle . . . upon a roadway until the movement can be made with reasonable safety nor without giving an appropriate signal." Ky. Rev. Stat. § 189.380(1). The statute further requires that "[a] signal indicating the intention to turn right or left shall be given continuously for not less than the last one hundred (100) feet traveled by the motor vehicle before the turn." *Id.* § 189.380(2).

First, Defendant asserts that the stop was not valid because the Kentucky statute at issue does not apply to parked cars, so the officer was not justified in pulling Defendant over for failing to signal as he pulled away from the curb onto the street. (Doc. # 47 at 2 (citing Ky. Rev. Stat. § 189.380)). Defendant further argues that he travelled less than one hundred feet prior to turning onto 13th Street, and that he was therefore not required to use a signal. *Id.* Specifically, because the distance was less than one hundred feet, Defendant argues that it was impossible for him to comply with the requirement of § 189.380(2) that he give a signal "for not less than the last one hundred feet traveled by the motor vehicle before the turn" and therefore he was not required to give "an appropriate signal" under § 189.380(1). (Doc. # 47 at 2). Rather, Defendant argues that all that was required for Defendant to comply with the statute was that he ensure it was "reasonably safe" to pull onto the road. *Id.*

Defendant's argument ignores the fact that Officer Ullrich observed Defendant fail to signal not only when he pulled away from the curb and when he turned onto 13th Street, but also a third time when Defendant pulled over into a parking lane at the corner of 13th Street and Wheeler. (Doc. # 46 at 13). However, even if the Court credited Defendant's position that the stop was solely based upon his failure to use the turn signal either during his initial pull-away from the curb or after travelling less than one hundred feet, this is insufficient to demonstrate that the stop was unlawful. Defendant does not point to any legal authority in support of his reading of § 189.380—most likely, because it directly contradicts his position. In interpreting the state statute at issue, Kentucky's highest court expressly rejected the argument that § 189.380 "only required drivers to ensure that their lane changes could be completed with reasonable safety before changing lanes."

8

*Commonwealth v. Fowler*, 409 S.W.3d 355, 358 (Ky. 2012) (suppression unwarranted in context of traffic stop for failure to signal in violation of § 189.380). Courts interpreting this provision have held that the signal requirement of § 189.380 applies to drivers changing lanes as well as those turning onto a roadway. *United States v. Sandoval*, 3:15-cr-107, 2017 WL 562180, at *2 (W.D. Ky. Feb. 10, 2017) (citing *Fowler*, 409 S.W.3d at 360-61).

Moreover, Kentucky courts have consistently indicated that a driver is required under the statute to signal when entering a roadway from a parked position—regardless of the distance driven prior to entering the roadway. *See, e.g.*, *Hollar v. Harrison*, 323 S.W.2d 219, 220-21 (Ky. Ct. App. 1959) (finding, in a personal injury action, that a driver was required to signal under § 189.380 when moving her vehicle a short distance from the side of the road to a driveway across the street); *Hargis v. Noel*, 221 S.W.2d 94, 95 (Ky. 1949) (indicating, in a personal injury action, the appellant violated § 189.380 when he stopped on the side of the highway to pick up a pedestrian and then pulled back onto the highway without signaling); *Davis v. Kunkle*, 302 Ky. 258, 259, 194 S.W.2d 513, 514 (1946) (indicating, in a personal injury action, the driver violated KRS § 189.380 by failing to make a left-turn signal when crossing from the right side of the road to a gas station on the left side); *United States v. Colbert*, No. 3:10-cr-151, 2011 WL 2746811, at *1 (W.D. Ky. July 13, 2011), *aff'd*, 525 F. App'x 364 (6th Cir. 2013) (finding a proper traffic stop under § 189.380 when the defendant failed to use his turn signal when leaving a park).

It is well settled that an officer has probable cause under the Fourth Amendment to stop a vehicle when he observes a driver violate a traffic law. *United States v. Hughes*, 606 F.3d 311, 315 (6th Cir. 2010). "So long as the officer has probable cause to believe

that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." *United States v. Colbert*, No. 3:10-CR-151, 2011 WL 2746811, at *3 (W.D. Ky. July 13, 2011) (citing *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)). *See also Whren v. United States*, 517 U.S. 806, 810 (1996). Here, the officer witnessed Defendant fail to signal before turning onto the roadway, before turning onto 13th Street, and before pulling into the parking lane. Accordingly, the officer had probable cause to believe that a traffic violation—namely, violation of § 189.380—had occurred, and the stop did not violate the Fourth Amendment. *See Colbert*, 2011 WL 2746811, at *3.

Defendant next argues that, even if Kentucky law requires drivers to signal prior to turning onto the roadway, Officer Ullrich could not have seen Defendant's vehicle pull out from the curb and turn right onto 13th Street from the officer's vantage point. (Doc. # 47 at 1-2). In contrast, Officer Ullrich testified that he observed Defendant's initial failure to signal from his rear-view mirror and later as he turned and followed Defendant. The Court credits Officer Ullrich's testimony.[4] Defendant's testimony at the evidentiary hearing was riddled with inconsistencies, false statements, and evasive answers which the Court did not find credible, particularly in light of the body-camera recording.[5] When Officer Ullrich

---

[4] The Court has reviewed the documents submitted by Defendant pertaining to Officer Ullrich's personnel file, *see* (Doc. # 54-1), but finds them irrelevant to the officer's credibility determination in the instant case. Specifically, nothing contained in the submission offers any insight into the events of the night in question, and none of the offered documents relate to the officer's general credibility or his ability to perceive and testify regarding this traffic stop and subsequent search. Nor does the submission alter the testimony already given under oath at the suppression hearing or dispute the accuracy of Officer Ullrich's prior testimony. Rather, Ullrich's testimony was, overall, strikingly consistent with the body-camera recording.

[5] Most notably, Defendant emphatically denied that he received his *Miranda* warnings despite the officers' clear *Miranda* delivery on the body-camera recording. *Compare* (Govt. Ex. 3 at 05:40:40) (depicting Officer Ullrich reciting the *Miranda* warnings to Defendant), *with* (Doc. #

informed Defendant that the reason for the stop was his failure to use a signal as he turned onto 13th Street, Defendant apologized, indicating an admission. (Govt. Ex. 1 at 05:24:41). The Court finds that Defendant's contemporaneous admission is more credible than the self-serving testimony given at the evidentiary hearing, and should be given greater weight.

Finally, Defendant argues that the initial traffic stop was improper because it was motivated by animus based upon his race as an African-American. However, the probable cause standard is objective, and the Sixth Circuit has consistently held that an officer's purported, subjective motivation for making a valid traffic stop is irrelevant. *See Schneider v. Franklin Cty.*, 288 F. App'x 247, 251 (6th Cir. 2008) (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996) ("Subjective intentions play no role in probable cause Fourth Amendment analysis")); *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008) ("[S]ubjective intent for executing the stop is irrelevant."); *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002) (citations omitted). When the officer's motive for the traffic stop is challenged, courts must look to whether the traffic violation occurred, rather than the officer's motive. *Sandoval*, 2017 WL 562180, at *2 ("because [the officer] observed Sandoval commit those two traffic infractions, any subjective motivations he might have had for making the stop are irrelevant."). As the Supreme Court explained, "[w]e of course agree with petitioners that the Constitution prohibits selective enforcement of the law based on considerations such as race." *Whren*, 517 U.S. at 813. That

---

46 at 100-101) ("I definitely wasn't read my Miranda rights. . . . Your Miranda rights is you have the right to remain silent. Anything you say will be used against you in a court of law. He never said that."). Defendant also testified that he had been waiting for his girlfriend on the night of the stop, but on the body-camera recording he can be heard telling the officers that he was driving for Uber.

prohibition, however, does not impact the Fourth Amendment analysis, because "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment." *Id.* Accordingly, the Supreme Court concluded that "[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Id.*

In support of his argument that the stop was unlawfully based upon racial animus, Defendant relies upon *United States v. Warfield*, 727 F. App'x 182 (6th Cir. 2018). In *Warfield*, the officer initiated a stop when he observed the defendant, an African-American, slightly drift in his lane, allowing the tires of his vehicle to touch the solid lane line and hash line dividing the lanes. *Id.* at 184. The defendant was otherwise driving under the speed limit with his hands properly positioned on the steering wheel. *Id.* The Sixth Circuit found that the initial traffic stop was unlawful because the officer pulled the defendant over "for, essentially, driving too cautiously" and for barely touching the center line. The Sixth Circuit questioned the officer's motives, but acknowledged that "[r]egardless of the officer's subjective motivations, a traffic stop is lawful if he has probable cause to believe a traffic violation occurred." *Id.* at 185-86. Under the objective standard, the Sixth Circuit held that, regardless of the officer's motive, because "[m]erely touching a lane line is not a violation of Ohio's marked lane statute," the officer lacked probable cause to initiate the stop. *Id.*

The instant case is distinguishable from *Warfield* because there was probable cause to initiate the stop. Here, as in *Colbert*, the officer observed Defendant's failure to use his turn signal in violation of Kentucky law. *See* Ky. Rev. Stat. § 189.380. Thus, the

initial stop was lawful, and Jackson's constitutional rights were not violated when the officer pulled him over for failing to use his turn signal.

B. **The search of the vehicle did not violate Defendant's Fourth Amendment rights.**

Suppression is unwarranted because the officers searched Defendant's vehicle upon reasonable suspicion of illegal activity based upon the officers' observations during the lawful stop. Specifically, the dog sweep was permissible because it was supported by reasonable suspicion and did not unconstitutionally extend the stop; further, the dog's indication of the presence of controlled substances gave the officers probable cause to search Defendant's vehicle. Counsel for Defendant conceded that Defendant was "not at all" challenging the training and certification of the dog, nor whether use of the K-9 unit "in and of itself" violated the Fourth Amendment. (Doc. # 46 at 5-6). However, Defendant does raise the issue of the officer's motivation for conducting a dog sweep as part of his overall challenge of the stop. (Doc. # 47 at 3-4). Again relying upon *Warfield*, 727 F. App'x 182, *see* Section III.A, *supra*, Defendant asserts that the conversion of a simple traffic stop to an investigation of controlled substances was suspect in light of Defendant's race and unlawfully prolonged the stop. (Docs. # 47 at 3, 59 at 1).

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). Officers may conduct a canine sniff during a lawful traffic stop as long as the sniff does not extend the duration of the stop beyond the time reasonably necessary to address the traffic violation that warranted the stop. *Id. See also Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (establishing that the use of a trained narcotics dog during a lawful traffic stop "generally does not implicate legitimate privacy interests"). *See also United States v. Garcia*, 496 F.3d 495, 504 (6th

Cir. 2007) (affirming district court's refusal to suppress evidence seized and finding that the "canine narcotics sniff was lawfully conducted as part of the investigatory stop").

Moreover, even if the initial purpose had been or could have been completed, police may extend a stop beyond what is necessary to effectuate the original purpose if "something happened *during the stop* to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (quoting *United States v. Davis*, 430 F.3d at 353 (emphasis in original)). *See also Garcia*, 496 F.3d at 504 (affirming district court's refusal to suppress evidence seized and finding that the "canine narcotics sniff was lawfully conducted as part of the investigatory stop").

When determining whether the officer had developed a reasonable suspicion of criminal activity, the court considers the totality of the circumstances. *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004). The officer "must point to 'specific and articulable facts' that are 'more than an ill-defined hunch.'" *Id.* at 630. "Police officers are permitted 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Shank*, 543 F.3d 309, 315 (6th Cir. 2008) (quoting *United States v. Martin*, 289 F.3d 392, 398 (6th Cir. 2002)).

Defendant's continued reliance on *Warfield* here is misplaced. In *Warfield*, the officer initiated the stop upon supposed suspicion of drunk driving. *Warfield*, 727 F. App'x at 184. Upon investigation into whether the defendant was intoxicated, however, the *Warfield* defendant passed a horizontal gaze test "with flying colors." *Id.* Nonetheless, the search continued. The officer then searched for outstanding warrants and conducted

a secondary criminal background check, again with no results. Nonetheless, despite having seen no indication of unlawful activity, the officer then called for a drug dog to be brought to the scene despite the fact that, by his own admission, the officer did not suspect illegal drugs. *Id.* at 185, 189. The Sixth Circuit expressed doubt with respect to the reasonableness of the scope and duration of the stop in that context. *Id.*

The circumstances here differ significantly from those in *Warfield*. Here, upon Officer Ullrich's reasonable investigation of a valid traffic stop, Defendant—completely unprompted—made several comments about controlled substances and claimed to be working as a DEA informant. (Doc. # 18). Unlike the stop in *Warfield*, where the shift from the drunk driving investigation to the narcotics investigation was unsupported by any specific and articulable indicia of criminal activity, Officer Ullrich was immediately confronted with indicia of drug-related activity. Defendant's unprompted statement about being an informant and the other facts known to the officers were sufficient to establish reasonable suspicion that criminal activity was afoot. Therefore, the officer's use of the canine after Defendant's references to drug-related activity did not impermissibly extend the traffic stop.

The dog's detection of controlled substances provided probable cause to conduct a search of Defendant's vehicle. The Fourth Amendment's prohibition against unreasonable searches and seizures "extend[s] to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Chandler*, 437 F. App'x 420, 425 (6th Cir. 2011) (internal citations omitted). Accordingly, the Fourth Amendment generally requires that police obtain a warrant before conducting a search. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). In the context of movable vehicles, however,

warrantless searches are constitutional upon a finding of probable cause such that "there is a fair probability that contraband or evidence of a crime will be found in a particular place."[6]  *United States v. Cope*, 312 F.3d 757, 775 (6th Cir. 2002) (internal citation omitted).  *See also California v. Acevedo* 500 U.S. 565, 580 (1990) ("The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained").

A positive reaction by a properly trained narcotics dog establishes probable cause for the presence of controlled substances and justifies a warrantless search of a stopped vehicle.  *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1994); *United States v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999) (citing *United States v. Diaz*, 25 F.3d 392, 394 (6th Cir. 1994) ("It is well-established in this Circuit that an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle.")).  Accordingly, the dog's positive signal for the presence of narcotics gave the officers probable cause to search Defendant's vehicle.  It is clear that upon the dog's positive signal, the police officers had reasonable grounds to believe that further evidence of a crime may be found inside the vehicle.  Accordingly, the search of Defendant's vehicle was lawful, and Defendant's Fourth Amendment rights were not violated.

---

[6]    In support of his claim that the officers' search of his vehicle was unreasonable, Defendant relies on *Arizona v. Gant*, 556 U.S. 332 (2009).  Defendant's argument is misplaced.  Unlike the instant action, in *Gant*, there was nothing to justify a reasonable belief that "evidence relevant to the crime of arrest might be found in the vehicle."  *Gant*, 556 U.S. at 343, 347.  *See also U.S. v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999) ("It is well-established in this Circuit that an alert by a properly-trained and reliable dog establishes probable cause sufficient to justify a warrantless search of a stopped vehicle").

## C. The evidence seized from the search of Defendant's person would have inevitably been discovered.

Finally, Defendant argues that suppression is warranted because the officers lacked probable cause to search his person, and, even if a search were proper, the officers exceeded the scope of a reasonable search because of the intrusive and public nature of Officer Ullrich's retrieval of the methamphetamine from Defendant's underwear. (Doc. # 47 at 3-4). Even accepting that Defendant's arguments were correct,[7] suppression is nonetheless unwarranted under the circumstances because the evidence would inevitably have been discovered during a search incident to arrest.

The alleged constitutional violation does not warrant suppression of the evidence—namely, controlled substances—found on the Defendant's person. "[W]here 'tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered." *United States v. Witherspoon*, 467 F. App'x 486, 490 (6th Cir. 2012) (quoting *Murray v. United States*, 487 U.S. 533, 539 (1988)). This rule applies "(1) when an independent, untainted investigation . . . inevitably would have uncovered the same evidence'; or (2) when there exist 'other compelling facts establishing that the disputed evidence inevitably would have been discovered.'" *Id.* (quoting *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995)).

---

[7] Sufficient probable cause for the search of the Defendant's vehicle existed solely because of the dog's positive result. *See Berry*, 90 F.3d at 153; *United States v. Knox*, 839 F.2d 285, 294 n.4 (6th Cir. 1988) ("[T]he positive reaction of the Narcotics Unit dog alone would have established probable cause to not only search defendants' luggage, but to arrest them immediately."). A finding, therefore, that either the frisk of Defendant by Officer Lusardi or the initial search of Defendant's person by Officer Ullrich was unconstitutional does not impact the existence of probable cause to search Defendant's vehicle and would not change the Court's ultimate conclusion. Thus, it need not be addressed by the Court.

The Court has determined that because, following a valid stop, the valid dog sweep alerted to the presence of controlled substances, the officers had probable cause to search the vehicle. The search of the Defendant's vehicle yielded marijuana as well as part of a digital scale. As such, the search provided reasonable grounds—independent of the methamphetamine found on the Defendant's person—for the officers to believe that the Defendant was engaged in the illegal possession and/or distribution of controlled substances sufficient to justify an arrest. Incident to the Defendant's arrest, the officers would be permitted to perform a search of the Defendant's person for any other contraband or evidence related to drug-trafficking. *See Chimel v. California*, 395 U.S. 752, 763 (1969) (holding that a police officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person); *United States v. Mohammed*, 512 F. App'x 583, 589 (6th Cir. 2013) (upholding inevitable discovery doctrine as the basis for denial of motion to suppress when evidence seized from defendant's person would ultimately have been uncovered by search incident to arrest); *United States v. McGlown*, 150 F. App'x 462, 467-68 (6th Cir. 2005) (holding that cocaine found in the defendant's pocket would have been seized inevitably where probable cause existed for officers to arrest the defendant for carrying a concealed weapon and for reckless discharge of a firearm, and where following routine procedures, once defendant was placed under arrest, the officers would have discovered the cocaine during a search incident to arrest); *United States v. Kaye*, 492 F.2d 744, 746 (6th Cir. 1974) ("[I]ncident to making a lawful custodial arrest, a full search of the person may be made without a warrant."). As such, the officers would have inevitably discovered the methamphetamine in the Defendant's underwear.

Accordingly, suppression of the evidence found on the Defendant's person is unwarranted.

IV.     **CONCLUSION**

Accordingly, for the reasons stated herein, **IT IS ORDERED** as follows:

(1)     Defendant's duplicate, handwritten letters dated August 28, 2018 shall be **filed of record**; and

(2)     that the Defendant Rodney Lawrence Jackson's Motion to Suppress (Doc. # 15) is hereby **DENIED**;

(3)     This matter is set for a **Status Conference** on **Tuesday, September 25, 2018 at 1:00 p.m. in Covington**.

This 18th day of September, 2018.



Signed By:
David L. Bunning
United States District Judge

L:\DATA\ORDERS\Covington Criminal\2017\17-50 MOO.docx